## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| DALE C. GITTINGS, ) | |
| ) | |
| Plaintiff, ) | Case No. |
| ) | |
| v. ) | |
| ) | **Plaintiff Demands Trial by Jury** |
| TREDEGAR FILM PRODUCTS, a ) | FILED: SEPTEMBER 2, 2008 |
| division of TREDEGAR CORPORATION; ) | 08CV4972 |
| and, SUN LIFE ASSURANCE COMPANY ) | JUDGE SHADUR |
| OF CANADA, a corporation, d/b/a SUN ) | MAGISTRATE JUDGE SCHENKIER |
| LIFE FINANCIAL, ) | EDA |
| ) | |
| Defendants. ) | |

### COMPLAINT AT LAW

Plaintiff, DALE C. GITTINGS, by and through his attorneys, JAMES F. BEST and

KIMBERLY A. CARR of BEST, VANDERLAAN & HARRINGTON, and STEPHEN P.

CARPONELLI and DON TAYLOR of CARPONELLI and KRUG, for his Complaint against

Defendants TREDEGAR FILM PRODUCTS, a division of TREDEGAR CORPORATION

(hereinafter "TREDEGAR") and  SUN LIFE ASSURANCE COMPANY OF CANADA, a

corporation, d/b/a SUN LIFE FINANCIAL (hereinafter "SUN LIFE"), hereby states as follows:

### NATURE OF CLAIMS

1.    This is an action seeking redress against Defendant TREDEGAR for violations of the

Americans with Disabilities Act of 1990 (hereinafter "ADA"); the Employee Retirement

Income Security Act, (hereinafter "ERISA"), the Age Discrimination in Employment Act

("ADEA"), and retaliatory discharge. All paragraphs within the Complaint below may be

pled in the alternative.

1

2. This is also an action seeking redress against Defendant SUN LIFE for violations of the Employee Retirement Income Security Act, ("ERISA"), for willful failure to provide benefits due pursuant to an employee long term disability policy. All paragraphs within the Complaint below may be pled in the alternative.

## PARTIES

3. DALE GITTINGS (hereinafter "GITTINGS" or "Plaintiff") is a male citizen of the United States and currently is a resident of Big Pine Key, Florida.

4. At all relevant times hereto, Plaintiff was a resident of Twin Lakes, Wisconsin, and at all times worked in Lake Zurich, Illinois as set forth below.

5. GITTINGS was at all relevant times an employee of Defendant, TREDEGAR and at all relevant times worked for Defendant TREDEGAR in the State of Illinois.

6. Defendant TREDEGAR FILM PRODUCTS is a company doing business in the State of Illinois with its main location at 352 Oakwood Road, Lake Zurich, Illinois.

7. Defendant TREDEGAR FILM PRODUCTS is a division of TREDEGAR CORPORATION with its main location at 1100 Boulders Parkway, Richmond VA.

8. Defendant SUN LIFE is a corporation headquartered in Wellesley Hills, MA, doing business in Illinois, including Northern Illinois, and was at all relevant times the Administrator, Underwriter and fiduciary of Plaintiff's Long Term Disability Insurance Policy.

## PROCEDURAL REQUIREMENTS

9. GITTINGS has fulfilled all conditions precedent to the institution of this action. He timely filed a Charge of Discrimination against Defendant TREDEGAR with the Equal

2

Employment Opportunity Commission and has received a Right to Sue letter from the EEOC. The Right to Sue letter is attached hereto and made part hereof as Exhibit "A."

10. Plaintiff has also exhausted all administrative remedies pursuant to the insurance policy with Defendant SUN LIFE.

## JURISDICTIONAL AND VENUE STATEMENT

11. Jurisdiction lies in this Court pursuant to 28 U.S.C. §1343(a)(3) and (4), 28 U.S.C. §1331, 29 U.S.C. § 1132, 42 U.S.C. § 12201 *et. seq.*, 29 U.S.C. §621 *et. seq.*

12. Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. §1391(b), as Plaintiff's causes of action arose herein.

## FACTUAL BACKGROUND

13. At all times relevant, Plaintiff GITTINGS was an employee of Defendant TREDEGAR, and had been at the time of his termination for nearly thirty-four (34) years.

14. At all times throughout the course of his employment, Plaintiff performed his job to the satisfaction of his employer, Defendant TREDEGAR.

15. In spite of the above, Plaintiff was treated differently by Defendant than other similarly situated non-disabled employees, and employees not in the ADEA's protected age group, in the terms and conditions of his employment because of his age at the time of his termination, fifty-one (51), and/or his disability, perceived disability or record of impairment, and because he exercised his rights afforded to him by the Americans with Disabilities Act.

16. In August of 2005, Plaintiff was involved in a motorcycle accident and sustained injuries to both of his knees, requiring several surgeries.

17. Plaintiff subsequently informed his employer, Defendant TREDEGAR, about his need to be absent from work in order to recuperate from the surgeries and for the need for light duty.

18. Plaintiff's physician stipulated Plaintiff's need to be off work and to subsequently only perform light duty during the recuperation from his surgeries.

19. On or about January 17, 2006, Plaintiff informed Defendant TREDEGAR that he was going to need to undergo total knee replacement surgery, and may not be the same after the procedure was complete, and that he was meeting with his physician the next day for the surgery's pre-screening exam.

20. On or about January 27, 2006, Plaintiff was terminated.

21. Defendant TREDEGAR was required to engage in a conversation or process with Plaintiff to determine how it could accommodate his disability, but failed to do so.

22. Plaintiff could have easily performed his job to the expectations of his employer with a reasonable accommodation.

23. Instead, Defendant TREDEGAR terminated Plaintiff on or about January 27, 2006 without justifiable cause, and the reasons provided were pretextual.

24. Plaintiff was terminated because of his age, and because Defendant TREDEGAR perceived Plaintiff as being disabled, and/or because of his disability.

25. Similarly situated employees who were not in the protected age group, and/or did not request disability leave were treated more favorably in the terms and conditions of their employment, in that they were not subjected to similar adverse employment actions, and retained their positions.

26. Plaintiff complained to Defendant TREDEGAR regarding the aforementioned actions, however, Defendant TREDEGAR refused to restore Plaintiff's position to the status of where it was prior to the onset of his disability and his termination.

27. The reasons given for Plaintiff's termination by Defendant TREDEGAR were pretextual.

28. The entire sequence of events recounted to this point occurred in violation of the ADEA, because of Plaintiff's age, 51; and/or his disability in violation of the ADA; and/or were in retaliation for exercising his rights under the ADA; and were intended to deprive him of his medical and other benefits he was entitled to as an employee of Defendant TREDEGAR.

29. At all relevant times, as an employee of Defendant TREDEGAR, Plaintiff was a participant in a Policy for Long Term Disability Insurance issued by Defendant SUN LIFE and bearing policy number 28486. (See policy attached hereto as Exhibit "B")

30. At all relevant times, and during the entire tenure of his employment at Tredegar, Plaintiff paid a monthly premium for disability insurance in order to receive 70% of his final pay upon becoming disabled.

31. On or about January 17, 2007, Plaintiff was declared permanently disabled by his physician, and shortly thereafter, Plaintiff was terminated on January 27, 2007.

32. After his termination, Plaintiff exercised his right to convert the disability policy to a personal policy.

33. Defendant SUN LIFE acknowledged receipt of the conversion request and received Plaintiff's premium check, but Defendant SUN LIFE refused to cash the same.

34. Upon Defendant SUN LIFE's refusal to cash Plaintiff's premium check, Plaintiff then timely sent Defendant SUN LIFE a written notice of a Proof Of Claim.

35. Defendant SUN LIFE subsequently denied Plaintiff's claim.

36. Plaintiff then timely sent notice of an appeal to Defendant SUN LIFE, which was also denied on March 2, 2007.

37. Plaintiff exhausted all of his administrative remedies in this regard with respect to his claim against Defendant SUN LIFE, prompting this action.

## COUNT I: DEFENDANT TREDEGAR
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990

38. Plaintiff repeats and reasserts the allegations of Paragraphs 1 through 37 as this paragraph 38 as if set forth fully herein.

39. At all times throughout the course of his employment, Plaintiff performed his job to the expectation of his employer and beyond.

40. At all relevant times, Plaintiff had and has a disability and a record of disability within the meaning of and defined under the Americans with Disabilities Act, and/or Defendant TREDEGAR perceived him as disabled.

41. At all relevant times, Plaintiff could perform his job functions with a reasonable accommodation from his employer.

42. Defendant TREDEGAR subjected Plaintiff to differential treatment and adverse actions in the course of his employment after learning of his disability, in violation of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §12201 *et. seq.*, including but not limited to, differences in terms and conditions of his employment, and termination. Any other reason given for said behavior is pretextual.

43. TREDEGAR'S actions were intentional, wilful and wanton, and done with reckless disregard for Plaintiff's federally protected rights and to his physical well being.

6

44.   As a direct and proximate result of the acts engaged in by Defendant TREDEGAR, Plaintiff suffered severe financial damages, including but not limited to loss of pay and benefits, past and future, loss of career opportunities, loss of future earnings and other incidentals and benefits of employment; severe emotional distress, humiliation, embarrassment; exacerbation of his medical condition; damage to reputation and other exemplary damages, attorneys fees, costs and other damages allowed under the ADA.

WHEREFORE, Plaintiff DALE C. GITTINGS respectfully requests judgment against Defendant TREDEGAR FILM PRODUCTS, a division of TREDEGAR CORPORATION, in an amount that will fully compensate him for his injuries and damages for Defendant's violation of Plaintiff's rights under the Americans with Disabilities Act of 1990 and award Plaintiff damages for loss of wages, past and future, loss of future earnings, loss of career opportunities, loss of employee benefits, past and future, exemplary/punitive damages, severe emotional distress, pain and suffering, embarrassment, humiliation, damage to reputation, exacerbation of his medical condition, medical costs, expense of litigation, expert witness fees, reasonable attorneys' fees, costs, liquidated damages and prejudgment interest, as well as any other further relief as the Court deems just and appropriate.

**COUNT II: DEFENDANT TREDEGAR**
**AMERICANS WITH DISABILITIES ACT**
**DENIAL OF REASONABLE ACCOMMODATION**

45.   Plaintiff repeats and reasserts the allegations of paragraphs 1-44 as this paragraph 45, as if fully set forth herein.

46.   At all times throughout the course of employment, Plaintiff performed his job to the expectation of his employer and beyond.

7

47. At all relevant times, Plaintiff had and has a disability and a record of disability within the meaning of and defined within the Americans with Disabilities Act, and Defendant TREDEGAR considered him disabled.

48. Plaintiff could perform his job functions with a reasonable accommodation from his employer.

49. Plaintiff sought an accommodation from Defendant TREDEGAR for his disability. As such, Defendant TREDEGAR was required to engage in an interactive process with Plaintiff to determine how to provide Plaintiff with a reasonable accommodation under the ADA, and provide such a reasonable accommodation to Plaintiff.

50. Defendant TREDEGAR failed to provide Plaintiff with a reasonable accommodation and failed to engage in an interactive exchange as required by the ADA.

51. Defendant TREDEGAR refused to grant Plaintiff a reasonable accommodation for his disability, in violation of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §12201 *et. seq.*, and instead terminated his employment without justifiable cause.

52. TREDEGAR'S actions were intentional, wilful and wanton, and done with reckless disregard for Plaintiff's federally protected rights and to his physical well being.

53. As a direct and proximate result of the acts engaged in by Defendant TREDEGAR, Plaintiff suffered severe financial damages, including but not limited to loss of pay and benefits, past and future, loss of career opportunities, loss of future earnings and other incidentals and benefits of employment; severe emotional distress, humiliation, embarrassment; exacerbation of his medical condition; damage to reputation, and other exemplary damages, attorneys fees, costs and other damages allowed under the ADA.

8

WHEREFORE, Plaintiff DALE C. GITTINGS respectfully requests judgment against Defendant TREDEGAR FILM PRODUCTS, a division of TREDEGAR CORPORATION, in an amount that will fully compensate him for his injuries and damages for Defendant's violation of Plaintiff's rights under the Americans with Disabilities Act of 1990 and award Plaintiff damages for loss of wages, past and future, loss of future earnings, loss of career opportunities, loss of employee benefits, exemplary/punitive damages, severe emotional distress, pain and suffering, embarrassment, humiliation, damage to reputation, exacerbation of his medical condition, medical costs, expense of litigation, expert witness fees, reasonable attorneys' fees, costs, liquidated damages and prejudgment interest, as well as any other further relief as the Court deems just and appropriate.

## COUNT III: DEFENDANT TREDEGAR
## AMERICANS WITH DISABILITIES ACT
## RETALIATION

54.    Plaintiff repeats and reasserts the allegations of paragraphs 1-53 as this paragraph 54 as if fully set forth herein.

55.    At all times throughout the course of employment, Plaintiff performed his job to the expectation of his employer and beyond.

56.    Plaintiff has a disability within the meaning of and defined within the Americans with Disabilities Act, in that he could easily perform his job functions with or without a reasonable accommodation from his employer.

57.    Plaintiff was considered by his physician and his employer to be disabled during this time.

58.    Defendant TREDEGAR failed to provide Plaintiff with a reasonable accommodation and failed to engage in an interactive exchange as required by the ADA.

9

59. Plaintiff opposed the TREDEGAR'S unlawful conduct, however, Defendant TREDEGAR undertook further actions against him, including but not limited to, terminating him on or about January 27, 2006.

60. In taking the aforementioned adverse job actions against Plaintiff, Defendant TREDEGAR acted in retaliation against Plaintiff for his disability, and his request for a reasonable accommodation for the same in violation of Section 503(b) of the ADA.

61. TREDEGAR'S actions were intentional, wilful and wanton, and done with reckless disregard for Plaintiff's federally protected rights and to his physical well being.

62. As a direct and proximate result of the acts engaged in by Defendant TREDEGAR, Plaintiff suffered severe financial damages, including but not limited to loss of pay and benefits, past and future, loss of career opportunities, loss of future earnings and other incidentals and benefits of employment; exacerbation of his medical condition, attorneys fees, costs and other damages allowed under the ADA.

WHEREFORE, Plaintiff DALE C. GITTINGS respectfully requests judgment against Defendant TREDEGAR FILM PRODUCTS, a division of TREDEGAR CORPORATION, in an amount that will fully compensate him for his injuries and damages for Defendant's violation of Plaintiff's rights under the Americans with Disabilities Act of 1990 and award Plaintiff damages for loss of wages, past and future, loss of future earnings, loss of career opportunities, loss of employee benefits, exemplary/punitive damages, severe emotional distress, pain and suffering, embarrassment, humiliation, damage to reputation, exacerbation of his medical condition, medical costs, expense of litigation, expert witness fees, reasonable attorneys' fees, costs, liquidated damages and prejudgment interest, as well as any other further relief as the Court deems just and appropriate.

10

## COUNT IV: DEFENDANT TREDEGAR
## AGE DISCRIMINATION IN VIOLATION OF THE ADEA

63. Plaintiff repeats and reasserts the allegations of paragraphs 1-62 as this paragraph 63 as if fully set forth herein.

64. At all times throughout the course of his employment, Plaintiff performed his job to the expectation of his employer and beyond.

65. Plaintiff has a federally protected right to equal treatment in the workplace.

66. At the time Plaintiff's employment with Defendant TREDEGAR was terminated, Plaintiff was fifty-one (51) years old.

67. Younger individuals, many of whom had lesser seniority with Defendant TREDEGAR, were not terminated and were treated more favorably.

68. TREDEGAR'S proffered reason for the discharge is pretextual. The reason Plaintiff was discharged was due to his age.

69. Upon information and belief, Plaintiff was replaced by a younger individual.

70. By the above actions, but not limited to the same, Defendant TREDEGAR discriminated against Plaintiff in the terms, conditions and privileges of employment because of his age, in violation of the ADEA, and any alleged reasons given to the contrary are pretextual. Plaintiff has suffered and will continue to suffer significant damages as a result of the above.

71. By the above actions, but not limited to the same, Defendant TREDEGAR took adverse employment actions against Plaintiff, which seriously affected his physical and psychological well-being, and caused him to suffer significant damages.

72. TREDEGAR'S wrongful acts, individually and/or by and through its agents, were intentional, willful and wanton, and in total disregard and reckless indifference to

11

Plaintiff's rights under the ADEA.

73. As a direct and proximate result of the acts engaged in by Defendant TREDEGAR, Plaintiff suffered severe financial damages, including but not limited to loss of pay, past and future, loss of career opportunities, loss of benefits, past and future, loss of future earnings and other incidentals and benefits of employment; severe emotional distress, humiliation, embarrassment; physical harm, damage to reputation, attorneys' fees, costs and other damages allowable under the ADEA.

74. The above-mentioned acts of Defendant TREDEGAR, individually and through its agents, were willful, wanton, malicious and oppressive and justify the awarding of exemplary and liquidated damages, Plaintiff has suffered and will continue to suffer significant damages as a result of the above.

WHEREFORE, Plaintiff, DALE C. GITTINGS, respectfully requests judgment against Defendant , TREDEGAR FILM PRODUCTS, a division of TREDEGAR CORPORATION, in an amount that will fully compensate him for his injuries and damages for Defendant's violation of Plaintiff's rights under the ADEA and award Plaintiff damages for loss of wages, past and future, loss of future earnings, loss of career opportunities, loss of employee benefits, past and future, court costs, expense of litigation, expert witness fees, reasonable attorneys' fees, liquidated damages and prejudgment interest, as well as any other further relief as the Court deems just and appropriate.

**COUNT V: DEFENDANT TREDEGAR**
**VIOLATION OF EMPLOYEE RETIREMENT INCOME SECURITY ACT ("ERISA")**

75. Plaintiff repeats and reasserts the allegations of paragraphs 1-74 as this paragraph 75, as though fully set out herein.

76.  At all relevant times herein, Plaintiff was a participant and beneficiary of the welfare, pension and health benefit plans provided by Defendant TREDEGAR.

77.  At all relevant times, Plaintiff performed his job functions to the satisfaction of his employer and beyond.

78.  GITTINGS was terminated on or about January 27, 2006, in order to deprive him of continued participation in Defendant TREDEGAR'S funded employee welfare, pension and health benefit programs.

79.  Defendant TREDEGAR'S motivation and intent for terminating Plaintiff was discriminatory, and in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1132 *et seq.*

80.  Defendant TREDEGAR can offer no legitimate reason for such differential treatment or for the denial of Plaintiff's participation in said employee benefit programs; any proffered reason is pretext for Defendant TREDEGAR'S illegal motivation.

81.  Defendant TREDEGAR'S actions were intentional, wilful and wanton, and done with reckless disregard for Plaintiff's federally protected rights and to his physical well being.

82.  As a direct and proximate result of the acts engaged in by Defendant TREDEGAR, Plaintiff suffered severe financial damages, including but not limited to loss of benefits, past and future, and other incidentals and benefits of employment; attorneys fees, costs and other damages allowed under ERISA.

WHEREFORE, Plaintiff DALE C. GITTINGS respectfully requests judgment against Defendant TREDEGAR FILM PRODUCTS, a division of TREDEGAR CORPORATION, in an amount that will fully compensate him for his injuries and damages for Defendant's violation of Plaintiff's rights under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.

13

§1132 *et seq.*, and award Plaintiff damages for his injuries and damages of the past and future, including but not limited to, equitable relief, lost employee benefits and other incidentals of employment, reasonable attorneys' fees, costs and prejudgment interest, as well as any other further relief as the Court deems just and appropriate.

## COUNT VI: DEFENDANT SUN LIFE
## VIOLATIONS OF EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA)

83. Plaintiff repeats and reasserts the allegations of paragraphs 1-37 as this paragraph 83, as though fully set out herein.

84. At all relevant times herein, GITTINGS was a participant and beneficiary of a policy for Long Term Disability Insurance provided by Defendant SUN LIFE, previously attached as Exhibit "B".

85. Said policy is governed by ERISA, pursuant to section 502(a), 29 U.S.C. §1002(1) and 29 U.S.C. §1003(a)(3), *et seq.*

86. Defendant SUN LIFE is an administrator, fiduciary and party at interest in the policy attached hereto as Exhibit "B" for purposes of ERISA.

87. As a fiduciary of Plaintiff's policy for Long Term Disability Insurance, Defendant SUN LIFE had a duty and responsibility to manage and administer said policy solely in the interest of participants and beneficiaries for the purpose of providing benefits to participants and beneficiaries, i.e., Plaintiff.

88. Defendant SUN LIFE breached its duties to Plaintiff in denying Plaintiff's claim(s) for benefits Plaintiff was entitled to under the policy, as Plaintiff's medical condition fell within the definition of "disability" as defined within Sun Life's policy. (see Exhibit "B").

14

89.    SUN LIFE further breached its duty to GITTINGS in not resolving any ambiguities in

coverage applicability strictly in GITTINGS' (the insured's) favor.

90.    Defendant SUN LIFE's decisions and conduct in denying benefits owed to Plaintiff was

arbitrary, capricious, motivated by bad faith, and was not fair and reasonable.

91.    Defendant SUN LIFE's actions with regard to denying GITTINGS' claims were a breach

of his contract of insurance with Defendant SUN LIFE.

92.    Defendant SUN LIFE's actions with regard to denying GITTINGS' request for a

conversion of the policy to a personal policy was a breach of his contract of insurance

with Defendant SUN LIFE.

93.    Defendant SUN LIFE's actions were intentional, wilful and wanton, and done with

reckless disregard for Plaintiff's federally protected rights and to his physical, mental and

financial well being.

94.    Plaintiff has suffered significant damages as a result of the above, and will continue to so

suffer into the future, including loss of benefits, as well as miscellaneous costs and

attorney's fees and costs.

WHEREFORE, Plaintiff DALE C. GITTINGS, respectfully requests judgment against

Defendant SUN LIFE ASSURANCE COMPANY OF CANADA, a corporation, d/b/a SUN

LIFE FINANCIAL, to the extent that will fully compensate Plaintiff for damages of the past and

future, including but not limited to the following relief:

(a) A declaration from the Court (declaratory judgment) that GITTINGS' disability as

described above is fully covered under SUN LIFE's policy, and full benefits must be paid

pursuant to the policy;

(b) An injunction against any future denial of any benefits under the SUN LIFE policy for GITTINGS' disability as described herein;

(c) Reimbursement of any lost benefits and/or costs GITTINGS paid out of pocket for since SUN LIFE'S wrongful denial of benefits;

(d) Attorney fees and costs;

(e) Any other further relief as the Court deems just and appropriate.

## COUNT VII: DEFENDANT SUN LIFE

## VIOLATIONS OF EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA)

## BREACH OF FIDUCIARY DUTY

## 29 U.S.C.A §1109

95.    Plaintiff repeats and reasserts the allegations of paragraphs 1-37 and 83-94 as this paragraph 95, as though fully set out herein.

96.    At all relevant times herein, GITTINGS was a participant and beneficiary of a policy for Long Term Disability Insurance provided by Defendant SUN LIFE, previously attached as Exhibit "B".

97.    Said policy is governed by ERISA, pursuant to section 502(a), 29 U.S.C. §1002(1) and 29 U.S.C. §1003(a)(3), et seq.

98.    Defendant SUN LIFE is an administrator, fiduciary and party at interest in the policy attached hereto as Exhibit "B" for purposes of ERISA.

99.    As a fiduciary of Plaintiff's policy for Long Term Disability Insurance, Defendant SUN LIFE had a duty and responsibility to manage and administer said policy solely in the interest of participants and beneficiaries for the purpose of providing benefits to participants and beneficiaries, i.e., Plaintiff.

100.    Defendant SUN LIFE breached its duties to Plaintiff in denying Plaintiff's claim(s) for benefits Plaintiff was entitled to under the policy. (see Exhibit "B").

16

101.    Defendant SUN LIFE's decisions and conduct in denying benefits owed to Plaintiff was arbitrary, capricious, motivated by bad faith, and was not fair and reasonable.

102.    Defendant SUN LIFE engaged in self dealing by acting in its own interest, rather than in the interest of the beneficiary of its long term disability policy.

103.    Defendant SUN LIFE's actions with regard to denying GITTINGS' claims were a breach of his contract of insurance with Defendant SUN LIFE.

104.    SUN LIFE had knowledge of the necessity of the long term disability benefits due and owing to GITTINGS, and with that knowledge knowingly participated in the denial of benefits GITTINGS and/or made no reasonable effort to remedy the same.

105.    Defendant SUN LIFE's actions were intentional, wilful and wanton, and done with reckless disregard for Plaintiff's federally protected rights and to his physical, mental and financial well being.

106.    Plaintiff has suffered significant damages as a result of the above, and will continue to so suffer into the future, including loss of benefits, as well as miscellaneous costs and attorney's fees and costs.

WHEREFORE, Plaintiff DALE C. GITTINGS, respectfully requests judgment against Defendant SUN LIFE ASSURANCE COMPANY OF CANADA, a corporation, d/b/a SUN LIFE FINANCIAL, to the extent that will fully compensate Plaintiff for damages of the past and future, including but not limited to the following relief:

        (a) A declaration from the Court (declaratory judgment) that GITTINGS' disability as described above is fully covered under SUN LIFE's policy, and full benefits must be paid pursuant to the policy;

17

(b) An injunction against any future denial of any benefits under the SUN LIFE policy for

GITTINGS' disability as described herein;

(c) Reimbursement of any lost benefits and/or costs GITTINGS paid out of pocket for

since SUN LIFE'S wrongful denial of benefits;

(d) Attorney fees and costs;

(e) Any other further relief as the Court deems just and appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully Submitted,

**DALE C. GITTINGS**

By:    _s/ Kimberly A. Carr_
       One of his Attorneys

**Carponelli & Krug**
Stephen P. Carponelli
Don F. Taylor
230 West Monroe Street, Ste. 250
Chicago, IL 60606
(312) 372-2707
(312) 641-6174 - facsimile

**Best, Vanderlaan & Harrington**
James F. Best
Kimberly Carr
2100 Manchester Road, Ste. 1420
Wheaton, IL 60187
(630) 752-8000
(630) 752-8763- facsimile
Attorney No.: 6272033 (Carr)

EEOC Form 161-B (3/98)

## U.S. Equal Employment Opportunity Commission

## Notice of Right to Sue (Issued on Request)

| To: | Dale C. Gittings<br>1707 Swallow Road<br>Twin Lakes, WI 53181 | From: | Chicago District Office<br>500 West Madison St<br>Suite 2800<br>Chicago, IL 60661 |
|---|---|---|---|

Certified Mail 7001 1940 0003 8824 8272

☐ *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 440-2007-01297 | Jerry Zhang,<br>Investigator | (312) 353-7522 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in a federal or state court WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

☐ More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☒ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

John P. Rowe,
District Director

6/12/2008
*(Date Mailed)*

cc:    TREDEGAR FILM PRODUCTS



08CV4972
JUDGE SHADUR
MAGISTRATE JUDGE SCHENKIER
EDA


Sun Life
of Canada®

# SUN LIFE ASSURANCE COMPANY OF CANADA

| | |
|---|---|
| **Policyholder:** | TREDEGAR CORPORATION |
| **Policy Number:** | 28486 |
| **Policy Effective Date:** | January 1, 1996 |
| **Policy Anniversary:** | January 1, 1997 |
| **Policy Amendment Effective Date:** | January 1, 2000 |

This Policy is delivered in Virginia and is subject to the laws of that jurisdiction. Premiums are due and payable monthly on the first day of each month. Policy anniversaries will be annual beginning on January 1, 1997.

Sun Life Assurance Company of Canada ("Sun Life") agrees to pay the benefits in accordance with all provisions provided by this Policy for Long Term Disability Insurance. This Policy is issued in consideration of the Application of the Policyholder, a copy of which is attached, and continued payment of premiums by the Policyholder. The following pages including any Riders, Endorsements or Amendments are a part of this Policy.

For the purpose of effective dates and termination dates under this Policy, all days begin and end at 12:00 midnight.

Signed at Sun Life's U.S. Headquarters, One Sun Life Executive Park, Wellesley Hills, MA 02481.

*[signature]*

President

## READ YOUR POLICY CAREFULLY

Group Term Insurance Policy

93P-LH Policy Face Page

EXHIBIT
B

# Table of Contents

| | Page Numbers |
|---|---|
| Section I Schedule of Benefits | 3 |
| Section II Definitions | 7 |
| Section III Eligibility and Effective Date | 13 |
| Section IV Long Term Disability Income Benefits | 15 |
| Section V Termination Provisions | 25 |
| Section VI General Policy Provisions | 28 |
| Section VII Claim Provisions | 31 |
| Section VIII Premiums | 33 |

Section I
Schedule of Benefits

**ELIGIBLE CLASSES**

All full-time Employees

Working a minimum of 30 hours per week

**WAITING PERIOD**

1st of the month coincident with or next following 12 months of the Employee's continuous employment

**LONG TERM DISABILITY INSURANCE**

**CLASSIFICATION**

Class A-Option 1    Corporate Employees and Tredegar Film Products Salaried and Wage Employees

Class A-Option 2    Corporate Employees and Tredegar Film Products Salaried and Wage Employees

Class A-Option 3    Corporate Employees and Tredegar Film Products Salaried and Wage Employees

Class B          All Other Salaried Employees

Class A-Option 1

   a.    The **Benefit Percentage** is 50%.

   b.    The **Maximum Monthly Benefit** is $10,000.

Class A-Option 2

   a.    The **Benefit Percentage** is 60%.

   b.    The **Maximum Monthly Benefit** is $10,000.

Class A-Option 3

   a.    The **Benefit Percentage** is 70%.

   b.    The **Maximum Monthly Benefit** is $10,000.

93P-LH-SCHED

Page No. 3

Schedule of Benefits
January 1, 2000

**Class B**

a.    The **Benefit Percentage** is 60%.

b.    The **Maximum Monthly Benefit** is $10,000.

Applicable to Class A Employees only

Evidence of Insurability, satisfactory to Sun Life, will be required for any of the following reasons:
- an Employee who on his initial Eligibility Date elects Long Term Disability (Core) Insurance only and subsequently elects Long Term Disability (Buy-Up) Insurance; or
- an Employee who elects to increase his amount of Long Term Disability (Buy-Up) Insurance.

**Integration Method:**

Direct

The **Minimum Monthly Benefit** is $100.

**Elimination Period**

Applicable to Corporate Employees and Tredegar Film Products Salaried and Wage Employees

6 months

Applicable to All Other Salaried Employees

For an Employee with 1-5 years of service, 26 weeks; 5-7 years of service, 32 weeks; 7-9 years of service, 42 weeks; and 9 or more years of service, 52 weeks

**Section I**
**Schedule of Benefits**

**Maximum Benefit Period**

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than age 60 | To age 65, but not less than 60 months |
| 60 | 60 Months |
| 61 | 48 Months |
| 62 | 42 Months |
| 63 | 36 Months |
| 64 | 30 Months |
| 65 | 24 Months |
| 66 | 21 Months |
| 67 | 18 Months |
| 68 | 15 Months |
| 69 and over | 12 Months |

93P-LH-SCHED

Page No. 5

Schedule of Benefits
January 1, 2000

## CONTRIBUTIONS

Employees will not contribute to the cost of their Long Term Disability (Core) Insurance.

Employees will contribute to the cost of their Long Term Disability (Buy-Up) Insurance.

## INITIAL MONTHLY PREMIUM RATES

Long Term Disability Insurance                    To Be Advised

The initial monthly premium rates are guaranteed for 24 months from January 1, 1996 unless otherwise specified in Section VIII, Premiums.  See Section VIII, Premiums for more information.

93P-LH-SCHED

Page No. 6

Schedule of Benefits
January 1, 2000

## Section II
## Definitions

In this section Sun Life defines some basic terms needed to understand this Policy. All male terms include the female term, unless stated otherwise.

**For purposes of this Policy:**

**Actively at Work** means that an Employee performs all the regular duties of his job for a full work day scheduled by the Employer at the Employer's normal place of business or a site where the Employer's business requires the Employee to travel.

An Employee is considered Actively at Work on any day that is not his regular scheduled work day (i.e., vacation, layoff or an approved leave of absence), if the Employee:
- is not hospital confined; or
- is not disabled due to an injury or sickness; and
- was Actively at Work on his immediately preceding scheduled work day.

An Employee is considered Actively at Work if he usually performs the regular duties of his job at his home, if the Employee:
- is not hospital confined; or
- is not disabled due to an injury or sickness; and
- can perform all the regular duties of his job for a full work day and could do so at the Employer's normal place of business if required to do so.

**Application** means the document pertaining to the plan of insurance applied for by the Policyholder. This document is attached to this Policy.

**Certificate** means a written booklet prepared by Sun Life which includes any Riders, Endorsements or Amendments, illustrating a summary of:
1. the insurance benefits an Employee is entitled to;
2. to whom the benefits are payable; and
3. any limitations, exclusions or requirements that may apply.

**Contributory Insurance** means Long Term Disability (Buy-Up) Insurance for which the Employee is required to pay all or part of the premium.

**Eligibility Date** means the date or dates an Employee becomes eligible for insurance under this Policy. Classes eligible for insurance are shown in Section I, Schedule of Benefits.

**Employee** means a person who is employed by the Employer, working at least the number of hours shown in Section I, Schedule of Benefits, and paid regular earnings.

**Employer** means the Policyholder and includes any Subsidiary, Affiliated or Associated company named in the Application.

**Evidence of Insurability** means a statement or proof of an Employee's medical history upon which acceptance for insurance will be determined by Sun Life.

93P-LH-DEF

Page No. 7

Definitions
January 1, 2000

## Section II
## Definitions

**Grace Period** means the 31 days following a premium due date during which premium payment may be made.

**Hospital or Institution** means a facility licensed to provide full-time medical care and treatment under the direction of a full-time staff of licensed physicians.

**Injury** means bodily impairment resulting directly from an accident and independently of all other causes. Any Injury must occur and any disability must begin while the Employee is insured under this Policy.

**Non-Contributory Insurance** means Long Term Disability (Core) Insurance for which the premium is paid entirely by the Employer.

**Physician** means an individual who is operating within the scope of his license and is either:

1. licensed to practice medicine and prescribe and administer drugs or to perform surgery; or
2. legally qualified as a medical practitioner and required to be recognized, under this Policy for insurance purposes, according to the insurance regulations of the governing jurisdiction.

The Physician cannot be the Employee, his spouse or the parents, brothers, sisters or children of the Employee or his spouse.

**Policyholder** means the entity to whom the Policy is issued.

**Pregnancy** means childbirth, miscarriage, abortion or any disease resulting from or aggravated by the pregnancy.

**Sickness** means illness, disease or pregnancy. Any disability, because of Sickness, must begin while the Employee is insured under this Policy.

**U.S. Headquarters** means Sun Life Assurance Company of Canada, Wellesley Hills, MA 02481.

**Waiting Period** means the continuous length of time immediately before an Employee's Eligibility Date during which he must be in an Eligible Class. Any period of time prior to the Policy Effective Date the Employee was Actively at Work for the Employer will count towards completion of the Waiting Period. The Waiting Period is shown in Section I, Schedule of Benefits.

Section II
Definitions

**The following Definitions are applicable to Long Term Disability Insurance**

**Chemical and Environmental Illness** means an allergy or sensitivity to chemicals or the environment including but not limited to:

a) Environmental allergies
b) Sick Building Syndrome
c) Multiple Chemical Sensitivity Syndrome
d) Chronic Toxic Encephalopathy.

Chemical and Environmental Illness does not include Asthma or Allergy-induced reactive lung disease.

**Chronic Fatigue Illness** means an Illness that is characterized by a debilitating fatigue in the absence of known medical or psychological conditions, which includes but is not limited to:

a) Chronic Fatigue Syndrome as supported by Center for Disease Control Guidelines
b) Chronic Fatigue Immunodeficiency Syndrome as supported by Center for Disease Control Guidelines
c) Post Viral Syndrome
d) Limbic Encephalopathy
e) Epstein-Barr virus infection
f) Herpes virus type 6 infection
g) Myalgic Encephalomyelitis

Chronic Fatigue Illness does not include a disorder identified as a(n):

a) Neoplastic disorder
b) Neurologic disorder
c) Endocrine disorder
d) Hematologic disorder
e) Rheumatologic disorder
f) Depression

**Disability Benefit** when used with the term Retirement Plan, means a benefit which:

1. is payable under a Retirement Plan due to a disability as defined in that Plan; and

2. does not reduce the amount which would have been paid as Retirement Benefits at the normal retirement age under the Plan if the disability had not occurred.

**Drug and Alcohol Illness** means an illness which results from the abuse of alcohol, drugs or derivatives.

**Elimination Period** means a period of continuous days of Total or Partial Disability for which no LTD Benefit is payable. The Elimination Period is shown in Section 1, Schedule of Benefits and begins on the first day of Total or Partial Disability.

If the Employee returns to work for 15 working days or less during the Elimination Period and cannot continue working, the Total or Partial Disability will be treated as continuous. Only those days that the Employee is Totally or Partially Disabled will count toward satisfying the Elimination Period.

Section II
Definitions

**Family Social Security** means benefits that are paid by the Federal Social Security Act to an eligible spouse and/or children as a result of the Employee's Total or Partial Disability.

**Gross Monthly Benefit** means the Employee's Monthly Benefit before any reduction of Other Income Benefits as described in Section IV, Long Term Disability Income Benefits.

**Indexed Total Monthly Earnings** means the Employee's Total Monthly Earnings prior to the date his Total or Partial Disability began adjusted on the first of the month following 12 calendar months of Partial Disability Benefit payments and each annual anniversary thereafter. Each adjustment to the Indexed Total Monthly Earnings is the lesser of 10% or the current annual percentage increase in the Consumer Price Index for Wage Earners and Clerical Workers as published monthly by the U.S. Department of Labor. Sun Life reserves the right to use some other similar measurement if the Department of Labor changes or stops publishing the Consumer Price Index.

**LTD** means Long Term Disability.

**Maximum Monthly Benefit** means the largest amount payable monthly to an Employee under this Policy. The Maximum Monthly Benefit is shown in Section I, Schedule of Benefits.

**Mental Illness** means mental, nervous, psychological, emotional diseases, or behavioral disorders of any type.

**Musculoskeletal and Connective Tissue Illness** means a disease or disorder of the neck and back and sprains and strains of joints and adjacent tissues, including but not limited to:

a)  cervical, thoracic and lumbosacral back and its surrounding soft tissue
b)  Carpal Tunnel or repetitive motion syndrome
c)  Fibromyalgia
d)  Temporomandibular joint or craniomandibular joint disorder
e)  Myofascial pain
f)  Scoliosis that does not require surgery

93P-LH-DEF.2

Definitions
January 1, 2000

## Section II
## Definitions

Musculoskeletal and Connective Tissue Illness does not include:

a)  Herniated, ruptured or bulging discs with neurological abnormalities that are documented by electromyogram, and computerized tomography or magnetic resonance imaging

b)  Scoliosis that requires surgery

c)  Tumors, malignancies, or vascular malformation

d)  Radiculopathies that are documented by electromyogram

e)  Spondylolisthesis, grade II or higher

f)  Myelopathies and myelitis

g)  Demyelinating diseases

h)  Traumatic spinal cord necrosis

i)  Osteopathies

j)  Rheumatoid or psoriatic arthritis

k)  Lupus

**Net Monthly Benefit** means the amount payable after reducing the Employee's Gross Monthly Benefit by any benefits the Employee receives or is eligible to receive from sources listed as Other Income Benefits shown in Section IV, Long Term Disability Income Benefits.

**Partial Disability or Partially Disabled** means the Employee, because of Injury or Sickness is unable to perform all of the material and substantial duties of his own occupation on a full-time basis, but he is:

1.  performing at least one of the material and substantial duties of his own occupation or another occupation on a part-time or full-time basis; and

2.  earning less than 80% of his Total Monthly Earnings due to the same Injury or Sickness that caused Total or Partial Disability.

The loss of a professional or occupational license or the inability to obtain or qualify for a license for any reason does not, in itself, constitute Partial Disability.

To qualify for benefits, the Employee must satisfy the Elimination Period with the required number of days of Total Disability, Partial Disability or a combination of Total or Partial days of Disability.

After 12 months of Partial Disability Benefit payments, #2 above is substituted with:

2.  earning less than 80% of his Indexed Total Monthly Earnings due to the same Injury or Sickness that caused Total or Partial Disability.

**Primary Social Security** means benefits paid by the Federal Social Security Act to an Employee if he becomes Totally or Partially Disabled.

## Section II
## Definitions

**Retirement Plan** means a program which provides retirement benefits to Employees and is not funded wholly by Employee contributions. The term will not include a 401(k) plan, a profit sharing plan, a thrift plan, an individual retirement account (IRA), a tax sheltered annuity (TSA), a stock ownership plan, or a nonqualified plan of deferred compensation.

Employer's Retirement Plan is deemed to include any Retirement Plan:

1.    which is part of any federal, state, county, municipal or association retirement system; and
2.    for which the Employee is eligible as a result of employment with the Employer.

**Social Security** means the Federal Social Security Act which provides social insurance on a national scale.

**Total Disability or Totally Disabled** means during the Elimination Period and the next 24 months of Total Disability, the Employee, because of Injury or Sickness, is unable to perform all of the material and substantial duties of his own occupation. After benefits have been paid for 24 months, the Employee will continue to be Totally Disabled if he is unable to perform all of the material and substantial duties of any occupation for which he is or becomes reasonably qualified for by education, training or experience.

The loss of a professional or occupational license or the inability to obtain or qualify for a license for any reason does not, in itself, constitute Total Disability.

To qualify for benefits, the Employee must satisfy the Elimination Period with the required number of days of Total Disability, Partial Disability or a combination of Total or Partial days of Disability.

## All Other Employees

**Total Monthly Earnings** means the Employee's basic monthly earnings as reported by his Employer immediately prior to the first date Total or Partial Disability begins. Total Monthly Earnings does not include commissions, bonuses, overtime pay or any other extra compensation.

## Commissioned Salesmen

**Total Monthly Earnings** means the Employee's average monthly earnings from the W-2 form (the box which reflects wages, tips and other compensation) received from the Employer for the prior calendar year immediately prior to the first date Total or Partial Disability begins, or the average monthly earnings for the period of employment if no W-2 has been received.

Section III
Eligibility and Effective Dates

A.  **Eligible Classes**

The class(es) eligible for insurance are shown in Section I, Schedule of Benefits.

B.  **Eligibility Date**

An Employee in an Eligible Class will be eligible for insurance on the latest of the following dates:
1.  January 1, 1996, or
2.  the day after the Employee completes the Waiting Period.

If a former Employee is rehired by the Employer within 6 months of his termination date, all past periods of employment during which the Employee was Actively at Work with the Employer will count towards completion of the Waiting Period. The Employee's Eligibility Date will be the later of the date he is rehired or the day after completion of the Waiting Period.

If a former Employee is rehired by the Employer 6 months or later after his termination date, the Employee's Eligibility Date will be the day after he completes a new Waiting Period.

C.  **Effective Date of Insurance**

**Non-Contributory Insurance**

An Employee will be insured, subject to the Delayed Effective Date of Insurance, on his Eligibility Date.

**Contributory Insurance**

An Employee will be insured, subject to the Delayed Effective Date of Insurance, on one of the following dates:

a)  the Employee's Eligibility Date, if he has made a written application for insurance on or before that date; or

b)  the date the Employee makes a written application for insurance, if he applies on or before the 31st day after his Eligibility Date; or

c)  the date Sun Life approves the Employee's Evidence of Insurability, if the Employee makes a written application for Long Term Disability (Buy-Up) Insurance later than 31 days after his Eligibility Date. Evidence of Insurability is at the Employee's expense.

## Section III
## Eligibility and Effective Dates

### Delayed Effective Date of Insurance

The Effective Date of any initial, increased or additional insurance will be delayed for an Employee if he is not Actively at Work due to injury, sickness, layoff or leave of absence. The initial, increased or additional insurance will become effective on the date the Employee returns to an Actively at Work status.

### Refusal of Coverage

If an eligible Employee declines his insurance, or terminates his insurance while continuing to be eligible, by signing a refusal card, an eligible Employee will become insured after he applies for insurance and Evidence of Insurability is approved by Sun Life. Evidence of Insurability is at the Employee's expense.

### Changes in Insurance

Changes in an Employee's amount of insurance due to a:

- change in an Employee's salary;
- change in an Employee's classification for insurance;

will take effect January 1st of each calendar year based on base pay on October 1st of the previous year for Corporate Employees and Tredegar Film Employees, and immediately upon the date of change for All Other Employees.  However, any increase in insurance will be subject to the Delayed Effective Date of Insurance provision.

Section IV
Benefit Provisions

Long Term Disability Income Benefits

If Sun Life receives Notice and Proof of Claim that an Employee is Totally or Partially Disabled, a Net Monthly Benefit will be payable, subject to the Limitations and Exclusions.

To be eligible to receive a Net Monthly Benefit, the Employee must:

1.  satisfy the Elimination Period with the required days of Total or Partial Disability;
2.  provide proof of continued Total or Partial Disability; and
3.  have regular and continuing care by a Physician who provides appropriate treatment by means of examination and testing in accordance with the disabling condition.

Proof of Total or Partial Disability must be given to Sun Life upon request and at the Employee's expense.

A Net Monthly Benefit will:

1.  be payable at the end of each month for that month;
2.  include reductions described as Other Income Benefits;
3.  be paid on a pro-rata basis. An amount equal to 1/30 of the Net Monthly Benefit is payable for each day of Total or Partial Disability that is less than a full month.

**Total Disability Benefit**

If an Employee is Totally Disabled, the Net Monthly Benefit will be calculated based on the Total Disability Benefit formula. An Employee qualifies for this benefit if, after completion of the Elimination Period and for the following 24 months, the Employee, because of Injury or Sickness, is unable to perform all of the material and substantial duties of his own occupation. After benefits have been paid for 24 months, the Employee will continue to qualify for this benefit if he is unable to perform all of the material and substantial duties of any occupation for which he is, or becomes, reasonably qualified for by education, training or experience.

To determine the Total Disability Benefit:

1.  Take the lesser of:

    a.    the Employee's Total Monthly Earnings multiplied by the Benefit Percentage (shown in Section I, Schedule of Benefits); or

    b.    the Maximum Monthly Benefit (shown in Section I, Schedule of Benefits); then

2.  Subtract Other Income Benefits from the amount determined in Step 1.

**Partial Disability Benefit**

If an Employee is Partially Disabled, the Net Monthly Benefit will be calculated based on the Partial

## Section IV
## Benefit Provisions

Disability Benefit formula. An Employee qualifies for this benefit if, after completion of the Elimination Period, the Employee, because of Injury or Sickness, is unable to perform all of the material and substantial duties of his own occupation on a full-time basis, but he is:

1.    performing at least one of the material and substantial duties of his own occupation or another occupation on a part-time or full-time basis; and

2.    earning less than 80% of his Total Monthly Earnings due to the same Injury or Sickness that caused the Total or Partial Disability. After 12 months of Partial Disability Benefits, Total Monthly Earnings will be Indexed Total Monthly Earnings.

During the first 24 months that an Employee returns to work, in his own occupation or another occupation, and is earning more than 20% of his Indexed Total Monthly Earnings, a Partial Disability Benefit will be paid.

To determine the Partial Disability Benefit:

1.    add the Employee's earnings from employment and income received from Other Income Benefits to the Total Disability Benefit.

2.    if this sum is in excess of 100% of the Employee's Indexed Total Monthly Earnings, subtract the amount in excess of 100% from the Total Disability Benefit. This result is the Partial Disability Benefit; or

if the sum is less than 100% of the Employee's Indexed Total Monthly Earnings, the Partial Disability Benefit is the Total Disability Benefit.

If the Employee is earning 20% or less of his Indexed Total Monthly Earnings, a Total Disability Benefit will be paid.

The Net Monthly Benefit will never be less than the Minimum Monthly Benefit shown in Section I, Schedule of Benefits unless otherwise specified in Adjustment of Benefits.

After 24 months of Partial Disability Benefits have been paid, the Employee will continue to receive a Partial Disability Benefit if he continues to be Partially Disabled and is earning more than 20% of his Indexed Total Monthly Earnings. The following proportionate loss formula will be used to determine the Net Monthly Benefit:

**Section IV**
**Benefit Provisions**

(A divided by B) multiplied by C

where:

A =  The Employee's Indexed Total Monthly Earnings minus the Employee's monthly earnings received from employment.

B =  The Employee's Indexed Total Monthly Earnings

C =  The Total Disability Benefit.

If the Employee is earning 20% or less of his Indexed Total Monthly Earnings, a Total Disability Benefit will be paid.

The Net Monthly Benefit will never be less than the Minimum Monthly Benefit shown in Section I, Schedule of Benefits unless otherwise specified in Adjustment of Benefits.

**Other Income Benefits**

Other Income Benefits are those benefits provided or available to the Employee while a Long Term Disability Benefit is payable. These Other Income Benefits, other than retirement benefits, must be provided as a result of the same Total or Partial Disability payable under this Policy. Other Income Benefits include:

1.  The amount the Employee is eligible for under:
    a.  Workers' Compensation Law; or
    b.  Occupational Disease Law; or
    c.  Unemployment Compensation Law; or
    d.  Compulsory Benefit Act or Law; or
    e.  any other act or law of like intent.

2.  The Railroad Retirement Act (including any dependent benefits).

3.  Any labor management trustee, union or employee benefit plans that are funded in whole or in part by the Employer.

4.  Any disability income benefits the Employee is eligible for under:
    a.  any other group insurance plan of the Employer;
    b.  any governmental retirement system as a result of the Employee's job with his Employer.

5.  The benefits the Employee receives under his Employer's Retirement Plan as follows:
    a.  any disability benefits;
    b.  the Employer-paid portion of any retirement benefits.
    (Disability benefits that reduce the Employee's accrued Retirement Benefit will be treated as a retirement benefit. Retirement benefits do not include any amount rolled over or transferred to any other retirement plan as defined in Section 402 of the Internal Revenue Code.)

## Section IV
## Benefit Provisions

6.  The disability or retirement benefits under the United States Social Security Act, or any similar plan or act, as follows:

    a.  Disability benefits the Employee is eligible to receive;
    b.  Disability benefits the Employee's spouse, child or children are eligible to receive because of the Employee's Total or Partial Disability unless the dependent benefits are paid directly to the divorced spouse or to the children in custody of the divorced spouse.
    c.  Retirement benefits received by the Employee;
    d.  Retirement benefits the Employee's spouse, child or children receive because of the Employee's receipt of retirement benefits unless the dependent benefits are paid directly to the divorced spouse or to the children in custody of the divorced spouse.

    If an Employee's Total or Partial Disability begins after age 70, Social Security Retirement Benefits will not apply if, prior to his Total or Partial Disability, he was already receiving Social Security Retirement Benefits.

7.  The amount the Employee receives from any accumulated sick leave.

8.  Any formal salary continuation paid to the Employee by his Employer which causes the Net Monthly Benefit, plus Other Income Benefits and any salary continuation to exceed 100% of the Employee's Total Monthly Earnings. The amount in excess of 100% of the Employee's Total Monthly Earnings will be used as a reduction.

9.  Any amount the Employee receives by compromise, settlement or other method as a result of a claim for any Other Income Benefit.

Other Income Benefits will include any amount described above which would have been available to the Employee had he applied for that benefit.

## Lump Sum Payment

If an Employee receives a lump sum payment for any Other Income Benefits, Sun Life will prorate the lump sum on a monthly basis over the time period specified for the lump sum payment. If no time period is stated, the lump sum payment will be prorated on a monthly basis over the Employee's expected lifetime as determined by Sun Life.

## Estimated Other Income

If, at the time of calculating any LTD benefit payments, the benefit an Employee is entitled to apply for and receive under any Other Income Benefits has not been awarded nor denied or if they have been denied and are being appealed, Sun Life will estimate the amount of that Other Income Benefit. The estimate will be used to reduce the amount of the LTD benefit payments until the Other Income Benefit has been awarded or denied. However, the estimate will not be used if, within six months of becoming Totally or Partially Disabled, the Employee meets both of the following conditions:

1.  the Employee has applied for the Other Income Benefits; and

2.  the Employee completes and signs a Reimbursement Agreement. This Agreement states that the

## Section IV
## Benefit Provisions

Employee promises to reimburse Sun Life any overpayment caused by an award of Other Income Benefits.

### Adjustment of Benefits

The Employee must notify Sun Life of the amount of Other Income Benefits when it is approved or adjusted (other than cost of living increases). Sun Life will make an adjustment to the Net Monthly Benefit payment when Sun Life receives written notice of the amount of the Other Income Benefit. Written Notice must be sent within 31 days after receipt of the Other Income Benefit award.

If after Sun Life makes an adjustment to the Net Monthly Benefit the Employee has been underpaid, Sun Life will make a lump sum refund of the amount that has been underpaid to the Employee.

If after Sun Life makes an adjustment to the Net Monthly Benefit the Employee has been overpaid, the Employee must reimburse Sun Life the amount of the overpayment within 31 days of the award. Sun Life has the option to reduce or eliminate future LTD benefit payments instead of requiring reimbursement in a lump sum. During the overpayment reimbursement period, the minimum monthly benefit will not apply.

### Cost of Living Freeze

After the first deduction for each of the Other Income Benefits, Sun Life will not reduce the LTD benefit payments due to cost of living increases an Employee receives from any of the sources described as Other Income Benefits. This does not apply to any increase in earnings the Employee receives from employment.

### Waiver of Premium for Totally or Partially Disabled Employees

LTD premium payments for a Totally or Partially Disabled Employee are waived during any period LTD benefits are payable under this Policy. If this Policy is in force when the Employee's Total or Partial Disability ends, the Employee will remain insured if he returns to an Actively at Work status in an Eligible Class and premium payments for the Employee are resumed.

### Termination of Long Term Disability Benefits

Total or Partial Disability Benefits will cease on the earliest of:

1.  the date the Employee is no longer Totally or Partially Disabled;

2.  the date the Employee dies;

3.  the end of the Maximum Benefit Period;

4.  the date the Employee fails to provide adequate employment earnings information or proof of continuing Total or Partial Disability as requested;

5.  the date the Employee's current earnings exceed 80% of his Indexed Total Monthly Earnings;

6. for the first 24 months of Total Disability or for Partial Disability, the date Sun Life determines the Employee is able to perform on a full-time basis all of the material and substantial duties of his own occupation, even if the Employee chooses not to work;

7. after the first 24 months of Total Disability, the date Sun Life determines the Employee is able to perform on a full-time basis all of the material and substantial duties of any occupation for which he is or becomes reasonably qualified for by education, training or experience, even if the Employee chooses not to work.

## Successive Periods

Successive periods of Total or Partial Disability after a Net Monthly Benefit was payable will be considered a single period if the Employee, in the time between the successive periods, was Actively at Work for less than:

1. six months, if due to the same or related causes;

2. one day, if due to an entirely unrelated cause.

The Employee will not have to complete a new Elimination Period. The LTD benefit will continue to be calculated based on the Employee's Total Monthly Earnings in effect at the time the initial period of Total or Partial Disability began. The LTD benefit will be payable, in total, for no longer than the Maximum Benefit Period at the time of the initial period of Total or Partial Disability.

This successive periods provision will cease to apply on the earliest of the following dates:

1. the date the Employee becomes eligible for benefits under any other group LTD policy; or

2. the date this Policy is terminated.

## Conversion Privilege

If an Employee's LTD insurance ceases due to termination of employment, an Employee may apply for a conversion policy. To be eligible for the Conversion Privilege, the Employee:

1. must have been insured for at least 12 consecutive months immediately before his LTD insurance under this Policy terminated; and

2. must be insured under this Policy's LTD Benefit Provision on the date he terminates employment.

The Employee must make a written application for the conversion policy within 31 days after termination of insurance. The benefits and amount of insurance may differ from those under the LTD Benefit Provision.

The Conversion Privilege is not available to any Employee whose insurance terminates for any of the following reasons:

1. the LTD insurance under this Policy has terminated; or

2. the Employee has retired; or

3. the Employee has attained age 70; or

## Section IV
### Benefit Provisions

The LTD Conversion Policy fully describes all benefits.

If the Employee becomes insured for LTD coverage under another employer's LTD plan within 31 days after termination of the Employee's insurance under this Policy, the Conversion Privilege is no longer available.

### Limitations

No LTD benefit will be payable for any Total or Partial Disability during any of the following periods:

1. any period the Employee is not under the regular and continuing care of a Physician providing appropriate treatment by means of examination and testing in accordance with the disabling condition.

2. any period the Employee fails to submit to any medical examination requested by Sun Life.

3. any period of Total or Partial Disability due to Mental Illness, unless the Employee is under the continuing care of a specialist in psychiatric care.

   Benefits will be payable for the first 24 months after the Employee completes his Elimination Period.

   Benefits after the first 24 months will only be payable if the Employee is confined in a Hospital or Institution licensed to provide psychiatric treatment.

4. any period of Total or Partial Disability due to Drug and Alcohol Illness, unless the Employee is actively supervised by a Physician or Rehabilitation Counselor and is receiving continuing treatment from a rehabilitation center or a designated institution approved by Sun Life.

   Benefits will be payable for the first 24 months after the Employee completes his Elimination Period if, during the Elimination Period the Employee:

   a)    becomes confined in a Hospital or Institution licensed to provide Drug and Alcohol treatment; or

   b)    begins participation in a Drug or Alcohol Rehabilitation Program acceptable to Sun Life.

   Benefits after the first 24 months will only be payable if the Employee is confined in a Hospital or Institution licensed to provide Drug and Alcohol treatment.

5. any period of Total or Partial Disability which begins in the first 12 months after the Employee's Effective Date of Insurance that is caused by, contributed to by, or resulting from a Pre-Existing

4. the Employee is not in an Eligible Class covered by this Policy; or
5. the Policy has been amended to exclude the Eligible Class to which the Employee belongs; or
6. the Employee has failed to make any required contributions; or
7. the Employee is Totally or Partially Disabled under the terms of the LTD Benefit Provision.

## Section IV
## Benefit Provisions

Condition unless the Total or Partial Disability begins after a period of 3 consecutive months after the Employee's Effective Date of Insurance, during which the he has not received medical treatment, consultation, care or services, including diagnostic measures, or taken prescribed drugs or medicines.

A Pre-Existing Condition means any Injury or Sickness for which the Employee has received medical treatment, consultation, care or services, including diagnostic measures, or took prescribed drugs or medicines within 3 months prior to his Effective Date of Insurance.

6. any period of Total or Partial Disability due to Chemical and Environmental Illness, unless the Employee is under the continuing care of a Physician providing appropriate treatment by means of examination and testing in accordance with the disabling condition.

Benefits will be payable for the first 24 months after the Employee completes his Elimination Period.

Benefits after the first 24 months will only be payable if the Employee is confined in a Hospital or Institution.

7. any period of Total or Partial Disability due to Chronic Fatigue Illness, unless the Employee is under the continuing care of a Physician providing appropriate treatment by means of examination and testing in accordance with the disabling condition.

Benefits will be payable for the first 24 months after the Employee completes his Elimination Period.

Benefits after the first 24 months will only be payable if the Employee is confined in a Hospital or Institution.

8. any period of Total or Partial Disability due to Musculoskeletal and Connective Tissue Illness, unless the Employee is under the continuing care of a Physician providing appropriate treatment by means of examination and testing in accordance with the disabling condition.

Benefits will be payable for the first 24 months after the Employee completes his Elimination Period.

Benefits after the first 24 months will only be payable if the Employee is confined in a Hospital or Institution.

## Exclusions

No LTD benefit will be payable for any Total or Partial Disability that is due to:

1. intentionally self-inflicted injury;
2. war, declared or undeclared, or any act of war;
3. active participation in a riot, rebellion or insurrection; or

93P-LH-LTD.2

Long Term Disability Income Benefit
January 1, 2000

## Section IV
## Benefit Provisions

4.    committing or attempting to commit an assault, felony or other illegal act.

## Continuity of Coverage

In order to prevent loss of coverage for an Employee when this Policy replaces a group LTD policy the Employer had in force with another insurer immediately prior to January 1, 1996, Sun Life will provide the following coverage:

## Section IV
## Benefit Provisions

### Employees not Actively at Work on January 1, 1996

An Employee may become insured under this Policy on January 1, 1996, subject to all of the following conditions:

1.  he was insured under the prior insurer's group LTD policy immediately prior to January 1, 1996; and
2.  he is not Actively at Work on January 1, 1996; and
3.  he is a member of an Eligible Class under this Policy; and
4.  premiums for the Employee are paid up to date; and
5.  he is not receiving or eligible to receive benefits under the prior insurer's group LTD policy.

If an Employee becomes Totally or Partially Disabled on or after January 1, 1996, any LTD benefit payable will be based on the prior insurer's definition of disability and will not exceed the prior insurer's maximum monthly benefit. All other provisions of Sun Life's Policy will apply.

### Total or Partial Disability due to a Pre-Existing Condition

LTD benefits may be payable to an Employee who becomes Totally or Partially Disabled on or after January 1, 1996 due to a Pre-Existing Condition, subject to the following conditions:

1.  he was insured under the prior insurer's group LTD policy immediately prior to January 1, 1996; and
2.  he was Actively at Work on January 1, 1996; and
3.  he was insured under this Policy on January 1, 1996.

Any benefit payable will be determined as follows:

1.  if the Employee satisfies the Pre-Existing Condition Limitation under this Policy, the LTD benefit will be determined according to this Policy's benefit provision.
2.  if an Employee cannot satisfy this Policy's Pre-Existing Condition Limitation, the prior insurer's pre-existing condition limitation will be applied.

a.  if the Employee satisfies the prior insurer's pre-existing condition limitation, giving consideration for continuous time insured under both policies, any benefit payable will be the lesser of:

    i.   the LTD benefit payable under this Policy; or
    ii.  the LTD benefit payable under the prior insurer's group LTD policy had it remained in force.

b.  if the Employee cannot satisfy the Pre-Existing Condition Limitation of this Policy or that of the prior insurer's group LTD policy, no LTD benefit will be paid.

**Termination of Employee's Insurance**

An Employee will cease to be insured on the earliest of the following dates:

1. the date this Policy terminates;
2. the date the Employee is no longer in an Eligible Class;
3. the date the Employee's Class is no longer included for insurance;
4. the last day any required premium has been made;
5. the date the Employee retires;
6. the date employment terminates. Cessation of Actively at Work will be deemed termination of employment, except:

    a.  insurance will be continued for an Employee absent due to a disability during:

        i.   the Elimination Period; and
        ii.  any period the premium is being waived under this Policy.

    b.  the policyholder may continue the insurance for up to 3 months of the Employee's paid vacation by paying required premium.

    c.  the policyholder may continue the insurance for up to 2 months after the Employee has been temporarily laid off or been given an approved leave of absence by the Employee paying the required premium to the policyholder.

        iii.  insurance may be continued for up to 3 months of the Employee's paid vacation.

    The Policyholder in all of the above situations must act so as not to discriminate unfairly among Employees in similar situations.

7. the date the Employee requests, in writing, to have his insurance terminated;

8. the date the Employee ceases to be Actively at Work due to a labor dispute, including any strike, work slowdown, or lockout; or

9. the date the Employee enters active duty in any armed service during a time of war (declared or undeclared).

While this Policy is in force, the Policyholder may continue an Employee's coverage pursuant to the Family and Medical Leave Act of 1993, as amended or continue coverage pursuant to a state required continuation period (if any).

While this Policy is in force, the Policyholder may continue an Employee's coverage pursuant to the Uniformed Services Employment and Reemployment Rights Act (USERRA).

## Section V
## Termination Provisions

### Termination of Policy

This Policy will terminate for any of the following reasons:

1. If the Policyholder fails to pay any premium within the Grace Period, this Policy will terminate on the last day of the Grace Period.

2. The Policyholder may terminate this Policy by advance written notice delivered to Sun Life at least 31 days prior to the termination date. This Policy will not terminate during any period in which premium has been paid. The Policyholder will be liable to Sun Life for all premiums due and unpaid for the full period this Policy is in force.

3. Sun Life may terminate this Policy on any premium due date by giving written notice to the Policyholder at least 31 days in advance if:

   a. the number of insured Employees is less than 25; or

   b. less than 100% of the Employees eligible are insured for Non-Contributory Insurance; or

   c. less than 75% of the Employees eligible are insured for Contributory Insurance; or

   d. the Policyholder fails to:

      i   furnish promptly any information Sun Life may reasonably require; or
      ii  perform any other obligations pertaining to this Policy.

4. Sun Life may terminate this Policy on any premium due date by giving written notice to the Policyholder at least 60 days in advance.

Termination of this Policy may take effect on an earlier date when both the Policyholder and Sun Life agree.

## Section V
## Termination Provisions

### Termination of Benefit Provision

A Benefit Provision will terminate for any of the following reasons:

1.  The Policyholder may terminate a Benefit Provision by advance written notice delivered to Sun Life at least 31 days prior to the termination date. The Benefit Provision will not terminate during any period in which premium has been paid. The Policyholder will be liable to Sun Life for all premiums due and unpaid for the full period that Benefit Provision is in force.

2.  Sun Life may terminate a Benefit Provision on any premium due date by giving written notice to the Policyholder at least 31 days in advance if:

    a.  the number of insured Employees for that Benefit is less than 25; or

    b.  less than 100% of the Employees eligible for that Benefit are insured for Non-Contributory Insurance; or

    c.  less than 75% of the Employees eligible for that Benefit are insured for Contributory Insurance; or

    d.  the Policyholder fails to furnish promptly any information Sun Life may reasonably require.

3.  Sun Life may terminate any Benefit Provision on any premium due date by giving written notice to the Policyholder at least 60 days in advance.

Termination of a Benefit Provision may take effect on an earlier date when both the Policyholder and Sun Life agree.

## Section VI
### General Policy Provisions

**A.    Statements**

All statements made in any Application are considered representations and not warranties. No representation by:

1.    the Policyholder in applying for this Policy will make it void unless the representation is contained in the Application; or

2.    any Employee in applying for insurance under this Policy will be used to reduce or deny a claim unless a copy of the Employee's written application for insurance is or has been given to the Employee or his beneficiary or his personal representative, if any.

**B.    Entire Contract - Policy Changes**

1.    This Policy is the entire contract.  It consists of:

    a.    all of the pages of the Policy;
    b.    the attached Application of the Policyholder;
    c.    each Employee's written application for insurance (Employee retains his own copy).

2.    This Policy may be changed in whole or in part.  Only an officer of Sun Life may approve a change.  The approval must be in writing and endorsed on or attached to this Policy.

3.    Any other person, including an agent, may not change this Policy or waive any part of it.

**C.    Employee's Certificate**

Sun Life will provide a Certificate to the Policyholder for delivery to each Employee.  The Certificate is intended to provide a brief explanation of the Policy benefits, but it does not form a part of this Policy.  If the terms of a Certificate and this Policy differ, this Policy will govern.

**D.    Furnishing of Information - Access To Records**

1.    The Employer will furnish at regular intervals to Sun Life:

    a.    information relative to individuals:

        i.    who qualify to become insured;
        ii.    whose amounts of insurance change; and/or
        iii.    whose insurance terminates.

    b.    any other information about this Policy that may be reasonably required.

The records which, in the opinion of Sun Life, are material to the insurance, will be opened for inspection by Sun Life at any reasonable time.

2.    Clerical error or omission will not:

## Section VI
## General Policy Provisions

The Policyholder's failure to report notice or proof of claim in a timely manner shall not constitute clerical error.

**E.    Misstatement of Facts**

If relevant facts about any individual were not accurate:
1.    an equitable adjustment of premium will be made; and
2.    the true facts will be used to determine if and in what amount insurance is valid under this Policy.

If the amount of the benefit is dependent upon an individual's age, (as shown in Section I, Schedule of Benefits), the benefit will be the amount an individual would have been entitled to if his correct age was known.

If an adjustment results in a refund of premium, the refund will not exceed a period of more than 12 months.

**F.    Examination**

Sun Life, at its own expense, has the right to have any person, whose Injury or Sickness is the basis of a claim:

1.    examined by a Physician, other health professional or vocational expert of its choice; and/or
2.    interviewed by an authorized Sun Life representative.

This right may be used as often as reasonably required.

**G.    Legal Proceedings**

No legal action may start:
1.    until 60 days after Proof of Claim has been given; nor
2.    more than 3 years after the time Proof of Claim is required.

**H.    Workers' Compensation**

This Policy is not in lieu of, and does not affect, any requirement for coverage by Workers' Compensation Insurance.

**I.    Agency**

For all purposes of this Policy, the Policyholder acts on its own behalf or as an agent of the Employee. Under no circumstances will the Policyholder be deemed an agent of Sun Life.

a.    deprive an individual of insurance;
b.    affect an individual's amount of insurance; or
c.    effect or continue an individual's insurance which otherwise would not be in force.

**Section VI**
**General Policy Provisions**

J.    **Incontestability**

Policyholder

The validity of this Policy shall not be contested, except for non-payment of premium, after it has been in force for two years from the Policy Effective Date.

Individual

No statement made by an individual, relating to his insurability for an initial, increased or additional amount of insurance, will be used in contesting the validity of that insurance, after such initial, increased or additional amount of insurance has been in force for a period of two years during the individual's lifetime.

This statement must be contained in a form signed by that individual.

Section VII
Claim Provisions

A.    Notice and Proof of Claim

Sun Life must receive Notice and Proof of Claim prior to any payment under this Policy.

1.    Notice

**for Long Term Disability** - written notice of claim must be given to Sun Life no later than 30 days before the end of the applicable Elimination Period or, within 30 days of the termination of this Policy, if earlier.

If notice cannot be given within the applicable time period, Sun Life must be notified as soon as it is reasonably possible.

When Sun Life has received written notice of claim, Sun Life will send the forms for proof of claim. If the forms are not received within 15 days after written notice of claim is sent, proof of claim may be sent to Sun Life without waiting for the form.

2.    Proof

**for Long Term Disability** - proof of claim must be given to Sun Life no later than 90 days after the end of the Elimination Period.

If it is not possible to give proof within these time limits, it must be given as soon as reasonably possible. Proof of claim may not be given later than one year after the time proof is otherwise required unless the individual is legally incompetent.

Proof of Claim shall consist of:
- what the disability is;
- the date the disability occurred; and
- the cause of the disability.

Proof of Claim includes, but is not limited to, Hospital records; Physician records; Psychiatric records; X-rays, narrative reports, or other diagnostic testing materials as required.

Sun Life may require as part of the Proof, authorizations to obtain medical and non-medical information.

Proof of the Employee's continued disability and regular and continuous care by a Physician must be given to Sun Life within 30 days of the request for proof.

Proof must be satisfactory to Sun Life.

An Employee's rights to any disability benefits are determined on the date the Employee's disability begins. These rights are subject to the terms of this Policy and will not be affected

**Section VII**
**Claim Provisions**

by subsequent amendment or termination of this Policy.

B.  **Time of Payment of Claims**

When Sun Life receives satisfactory Proof of Claim, benefits payable under this Policy will be paid for any period for which Sun Life is liable.

C.  **Payment of Claims**

Benefits payable during the lifetime of the Employee are payable to the Employee.

If a benefit is payable to the Employee's estate, an Employee who is a minor, or an Employee who is not competent, Sun Life has the right to pay up to $5,000 to any of the Employee's relatives whom Sun Life considers entitled. If Sun Life pays benefits in good faith to a relative, Sun Life will not have to pay those benefits again.

Section VIII
Premiums

A. **Premium Rates**

Sun Life determines its initial or any subsequent monthly premium rate on the basis of the coverage being provided. After the initial monthly premium rate has been in effect for 24 months from January 1, 1996, Sun Life has the right to recalculate any premium rate. However, Sun Life has the right to recalculate the initial or any subsequent monthly premium rate if any of the following occurs:

1. when the terms of this Policy are changed, including but not limited to the Schedule of Benefits; or

2. when a new Division, Subsidiary, Affiliated or Associated Company is added to or deleted from this Policy; or

3. when the number of Employees insured changes by 25% or more from the number of Employees insured on the Policy Effective Date or the immediately preceding Policy Anniversary Date; or

4. when one or more class(es) are added to or deleted from this Policy.

No premium rate may be increased unless Sun Life notifies the Policyholder at least 31 days in advance of the increase. Premium rate increases may take effect on an earlier date when both Sun Life and the Policyholder agree.

B. **Payment of Premiums**

1. All premiums due under this Policy, including adjustments, if any, are payable by the Policyholder on or before the respective due dates at Sun Life's U.S. Headquarters or at another location designated by Sun Life. The due dates are specified on the first page of this Policy.

2. The premiums due under this Policy on each premium due date are based upon the premium rates in effect for the benefit provided. The premium due is the sum of the monthly premiums for all insured Employees for all benefits.

3. Premiums payable to Sun Life will be paid in United States dollars on the premium due date.

4. The premium for additional or increased insurance becoming effective during a Policy month will be charged from the next premium due date.

5. The premium for insurance terminated during a Policy month will cease at the end of the Policy month in which such insurance terminates.

6. Except for fraud, premium adjustments, refunds or charges will be made for only:
   a. the current Policy Year; and
   b. the prior Policy Year.

C. **Grace Period**

93P-LH-PREM

**Section VII**
**Premiums**

The Grace Period is 31 days following a premium due date during which premium payment may be made. During the Grace Period the Policy shall continue in force, unless the Policyholder has given Sun Life written notice to discontinue this Policy. In any event, premiums are payable for any period of time the Policy remains in force.