IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DALE C. GITTINGS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 08 C 4972 |
| ) | |
| TREDEGAR CORPORATION, et al., ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM OPINION AND ORDER

Dale Gittings ("Gittings") has brought this action under a provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(a)(1)(B),[1] seeking long term disability payments pursuant to the Tredegar Corporation Employee Benefit Plan ("Plan"), which is underwritten by Sun Life Assurance Company of Canada ("Sun Life"). Although Gittings had named both the Plan and Sun Life as defendants, this Court has earlier explained that Sun Life is not a proper party under the well-established principles exemplified in such cases as <u>Blickenstaff v. R.R. Donnelley & Sons Co. Short Term Disability Plan</u>, 378 F.3d 669, 674 (7th Cir. 2004) and therefore dismissed it from the case.

Plan has now moved for judgment on the administrative record under Fed. R. Civ. P. ("Rule") 52.[2] Both parties have submitted

---

[1] All further citations to that and other ERISA provisions will take the form "Section--," using the Title 29 numbering.

[2] Gittings has also advanced several other claims against Tredegar that are not involved in the current motion.

an agreed administrative record, and each has tendered proposed findings of fact and conclusions of law and responses to the same.[3] Gittings has also tendered some additional exhibits with his initial Rule 52 briefing, and Plan has moved to strike those materials.

For the reasons stated in this memorandum opinion and order, Plan's motion for judgment on the administrative record is denied. This matter is remanded to Plan to make a more adequate assessment of whether Gittings was eligible to submit a claim for long term disability benefits under Plan.[4]

**Findings of Fact**

Gittings worked for Tredegar for more than 34 years (R. 88). His last occupation there was as Maintenance Supervisor, a position he had held from May 1, 2005 to January 27, 2006 (id.).

On August 22, 2005 Gittings was injured in a motorcycle accident (R. 135). His doctors determined that he had suffered a torn meniscus and scheduled surgery to treat the injury (id. 126). After the surgery Gittings developed an infection and required two further procedures (G. Mem. 7). After a lengthy recovery period when Gittings was out from work on short-term disability leave (R. 105), Gittings' doctors informed him that he

---

[3] This opinion will cite to the administrative record as "R. --" and will use "P." and "G." to refer to the parties' respective filings, with their memoranda cited "Mem. --."

[4] Plan's motion to strike is also therefore denied as moot.

would likely require a total knee replacement in the future (id. 126).

Gittings returned to work in either November or December of 2005 (R. 105, 159). He contends that he was on "light duty" after his return and that he never again resumed the regular duties of his occupation (id. 159-60). On January 27, 2006 Tredegar terminated Gittings (id. 88). Tredegar appears to have told Sun Life (acting as the claims administrator) that Gittings was fired for "company violations," though that is documented only in a letter from Sun Life to Gittings (id. 156).

On June 19, 2006 Gittings, through counsel, submitted a claim to Plan for long term disability benefits (R. 82-83). Plan responded with a request that Gittings return some required forms, including a personal statement and a statement from Gittings' physician detailing his injury and disability as well as his prognosis (id. 126-29, 133-49). Gittings provided those forms as well as authorization forms allowing Plan to request his medical records (id.).[5]

Plan also communicated with Tredegar, asking it to submit an employer's statement along with Gittings' payroll and attendance

---

[5] Plan asserts that Gittings did not submit any medical records with his claim or appeal. That appears to be true--other than the physician's statement his doctor filled out, Gittings did not himself provide any medical records to Sun Life. He did, however, provide it with authorization to request his medical records, and it appears he believed Sun Life would request whatever records it required to substantiate his claims.

3

records (R. 80). Tredegar submitted Gittings' payroll records from April 2005 to January 2006. But it provided his timesheets only for April through August 2005 and for January 2006, omitting the timesheets for the period following his accident and through his absence on short term disability leave (id. 103-07, 113-24). Tredegar claims that it had "[n]o knowledge of [Gittings'] disability on Jan. 27, 2006" (id. 96).

On July 25, 2006 Plan called Gittings' counsel to inform him that Gittings would not be covered for benefits because Gittings was working full time and receiving his full paycheck as of the date of his termination (R. 78, 155-56). Gittings appealed Plan's decision on January 16, 2007 (id. 78). His counsel noted in the appeal letter that Gittings was not, in fact, working in his own occupation when he was terminated but was instead performing only "light duty and office work" (id. 160). Gittings also resubmitted his physician's statement, personal statement and authorization forms (id.)

On March 2, 2007 Plan again denied Gittings' claim (R. 210-13). Plan stated that because Gittings had worked full time up to his termination with no loss of income and because he had filed for unemployment compensation benefits after his termination--then indicating that he could work--he did not appear to be unable to perform all of the material and

4

substantial duties of his occupation (id. 212).[6]

In March 2007 Gittings was awarded Social Security disability income retroactive to the date of his motorcycle accident (R. 78, G. Mem. 8). His attorney wrote Sun Life to inquire whether that award would affect Plan's denial of Gittings' long term disability claim (R. 78). Sun Life informed Gittings' attorney that he could submit the Social Security documentation with a request for review but that it would not consider the award determinative (id.). One month later Gittings' attorney followed up with Sun Life, stating that he was gathering the documentation and would submit it as soon as possible (id.). Sun Life replied that it would not review any further information and that it considered its March 2, 2007 decision regarding Gittings' claim to be final (id.). This suit followed.

## Conclusions of Law

**Standard of Review**

It is not disputed that Plan is an "employee welfare benefit

---

[6] In its letter denying Gittings' appeal, Plan also cited the lack of substantiation of Gittings' doctors' statement that Gittings had only "part-time sedentary functional capacity" (R. 212). But the review examiners' notes specifically state that Plan did not conduct a medical review "because the claim decision and the appeal decision are based on the fact that [Gittings] was no longer covered under the policy; it is at this point a moot question as to whether or not [he] was disabled throughout and beyond the [Elimination Period]" (id. 79). It appears then that Plan's review decision was again based solely on Gittings' payroll and attendance records.

5

plan" as defined by Section 1001(1)(A) and that Gittings is entitled to judicial review of Plan's final decision. Under the seminal teaching of Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), any such review is de novo unless Plan has reserved discretion to its administrator to determine when benefits are due or to interpret Plan provisions, in which event the court examines the record only to ensure that the decision was not arbitrary and capricious (id. 109-11).[7]

Though one court has found that the exact language presented here--"[p]roof must be satisfactory to Sun Life"--does trigger deferential review (Nance v. Sun Life Assurance Co. of Canada, 294 F.3d 1263, 1267-68 (10th Cir. 2002)), this Court is not bound by that finding. Nor does this Court find its reasoning persuasive. To be sure, Nance found that its ruling was consistent with our Court of Appeals' opinion in Herzberger v. Standard Ins. Co., 205 F.3d 327 (7th Cir. 2000), which is binding here. But later developments in this Circuit have negated such parallelism.

On that score, Herzberger, id. 331 had issued this caveat:

> We hold that the mere fact that a plan...requires proof or satisfactory proof of the applicant's claim...does not give the employee adequate notice that the plan

---

[7] Plan has argued that Gittings is bound to deferential review because he has alleged that Plan's decision was arbitrary and capricious. That is wrong. Deferential review is triggered solely by the terms of the Plan itself (Firestone, 489 U.S. at 115) and is not controlled by language used in the Complaint.

6

>     administrator is to make a judgment largely insulated
>     from judicial review by reason of being discretionary.

And that cautionary explanation has since been expanded in <u>Diaz v. Prudential Ins. Co. of Am.</u> ("<u>Diaz I</u>"), 424 F.3d 635, 639-40 (7th Cir. 2005):

>     In keeping with <u>Herzberger</u>, we conclude that the
>     critical question is whether the plan gives the
>     employee adequate notice that the plan administrator is
>     to make a judgment within the confines of pre-set
>     standards, or if it has the latitude to shape the
>     application, interpretation, and content of the rules
>     in each case.

<u>Diaz I</u>, <u>id</u>. at 639 dealt with language requiring "proof of continuing disability, satisfactory to Prudential, indicating that [the claimant is] under the regular care of a doctor." That unelaborated use of "satisfactory" is present here as well. This Court follows <u>Diaz I</u> in finding that language insufficient to trigger deferential review, for it gives no clue as to what would suffice as "satisfactory" proof or as to whether Plan "has the power to re-define the entire concept of disability...on a case-by-case basis" (<u>Diaz I</u>, 424 F.3d at 639). Hence de novo review is appropriate.

**Gittings' Threshold Eligibility Under the Plan**

Plan contends that because Gittings was terminated, his Plan coverage ceased on the day he was fired, making him eligible for long term disability benefits only if he was disabled on his last full day of employment. And because Gittings was working full

7

time and receiving his full paycheck on that last day of work, Plan argues that he could not qualify as disabled for Plan purposes before his coverage ceased. But that assertion is really not supported by the Plan language.

Plan cites several definitions in an effort to support its denial of Gittings' claim. First is the definition of "Totally Disabled" (R. 13):

> [D]uring the Elimination Period and the next 24 months of Total Disability, the Employee, because of Injury or Sickness, is unable to perform all of the material and substantial duties of his own occupation.

Next, "Elimination Period" is defined this way (R. 10):

> [A] period of continuous days of Total or Partial Disability for which no LTD [Long Term Disability] Benefit is payable. The Elimination Period . . . begins on the first day of Total or Partial Disability. If the Employee returns to work for 15 working days or less during the Elimination Period and cannot continue working, the Total or Partial Disability will be treated as continuous.

Plan also refers to the definition of "Actively at Work" (R. 8):

> [A]n Employee performs all the regular duties of his job for a full work day scheduled by the Employer at the Employer's normal place of business....

And finally Plan cites to the termination provisions (R. 26):

> An Employee will cease to be insured on the earliest of the following dates:
>
>    \*   \*   \*
>
>  6. the date employment terminates...

But on analysis, none of those definitions--or any other Plan language--requires that Gittings not be working at all or

8

that he must have suffered a loss of income to qualify as Totally Disabled (cf. the later appeal in Diaz v. Prudential Ins. Co. of America (Diaz II), 499 F.3d 640, 644 (7th Cir. 2007)). What follows is a relatively brief--but sufficient--explanation of that analysis.

As for Gittings' pay, it is true that the definition of "Partially Disabled" does require some loss of income.[8] And an inference might be drawn that if a loss of income is an ingredient of being "Partially Disabled," that must also be so in the "Totally Disabled" determination. But Plan is at best ambiguous in that regard, and de novo review does not compel deference to Plan's reading.

Indeed, where an ambiguity is present, this Court must interpret terms in favor of the insured--here, Gittings (Diaz II, 499 F.3d at 644). And in this instance the language about less

---

[8] Partial Disability is defined in these terms (R. 12):

> [T]he Employee, because of Injury or Sickness is unable to perform all of the material and substantial duties of his own occupation on a full-time basis, but he is:
>
> 1. performing at least one of the material and substantial duties of his own occupation or another occupation on a part-time or full-time basis; and
>
> 2. earning less than 80% of his Total Monthly Earnings due to the same Injury or Sickness that caused Total or Partial Disability.

9

than full earnings that is present in the Partial Disability definition is conspicuously absent from the definition of Totally Disabled, so that ordinary rules of contract construction call for a negative inference rather than that advanced by Plan. Hence Gittings' receipt of his full pay for his last day of full time employment does not render him ineligible for long term disability benefits under Plan.

As for Plan's argument that Gittings could not be considered Totally Disabled because he was working full time, no Plan language requires him not to have been working at all. Instead Total Disability requires only that Gittings be unable to perform "all of the material and substantial duties <u>of his own occupation</u>," not of any occupation at all.[9] Similarly, though the definition of Elimination Period refers to "working days," that is not a defined term. When read together with the definitions of Actively at Work and Total Disability, it is more than reasonable to read the reference to "working days" in the Elimination Period definition as those in which the employee

---

[9] Plan is correct in one respect as to the definition of Total Disability. Both Total Disability and Partial Disability use the word "all" to refer to the entire set of duties of a given occupation. Although Gittings argues that he could be considered Totally Disabled if he could perform <u>some</u> of his duties, that reading would render the definition of Partial Disability superfluous. "All" in the definition of Total Disability must be read to mean that a participant is eligible for Total Disability only if he cannot perform each of his duties.

performs "his own occupation" or "all the regular duties of his job."[10]

In addition, Actively-at-Work status is not referred to in the definitions of Total or Partial Disability. Instead the only time Plan refers to such status outside of the definition itself is in provisions setting forth when Plan coverage begins and ceases (R. 24-25). And while Plan is correct that "cessation of Actively at Work will be deemed termination of employment" (id. 26), there is an exception: "insurance will be continued for an Employee absent due to a disability during (I) the elimination period..." (id.). Plan omitted that language in its letter denying Gittings' appeal (id. 211).

In sum, the Plan language does not require an employee no longer to be working or to have suffered a loss of income to be considered Totally Disabled. And that reading is consistent with precedent in this circuit. As Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 918 (7th Cir. 2003) (internal citations omitted) teaches:

---

[10] Plan also repeatedly cites the fact that Gittings applied for and accepted unemployment benefits shortly after his termination as purported evidence that he was not disabled when he was fired. But again Plan's language does not require that Gittings be unable to work at all to be eligible for long term disability--only that he be unable to perform the duties of his own occupation. In contrast, receipt of unemployment compensation in Illinois is conditioned only on the applicant being able and available to work, without reference to occupation or duties (820 ILCS 405/500(C)).

11

> A desperate person might force himself to work despite
> an illness that everyone agreed was totally disabling.
> Yet even a desperate person might not be able to
> maintain the necessary level of effort indefinitely....
> A disabled person should not be punished for heroic
> efforts to work by being held to have forfeited his
> entitlement to disability benefits should he stop
> working.

Thus there is no inconsistency in Gittings having been on the payroll, working eight hours a day, while also disabled for Plan purposes--particularly if he was performing duties that were not part of his own occupation.

To be sure, if Gittings was in fact performing part or all of the duties of his own occupation on his last day of work, he would not have been eligible for Long Term Disability. But no record evidence speaks to what exactly Gittings was doing on his last day of work.[11] Plan based its decision that Gittings was ineligible on Tredegar's assertions that Gittings was working full time for full pay and that it had no knowledge of his disability. But Gittings made contrary assertions, which Plan did not investigate despite having a duty to make a "reasonable inquiry" into his duties at the time of his termination (see <u>Quinn v. Blue Cross & Blue Shield Ass'n</u>, 161 F.3d 472, 476 (7th Cir. 1998)). On the record before this Court, it is unable to make any factual determination as to Gittings' Plan eligibility.

---

[11] Both the administrative record and the supplemental materials submitted by Gittings are silent in that regard.

**Conclusion**

This matter is remanded to Plan for reconsideration and for further development of the administrative record to determine whether Gittings is eligible for long term disability benefits under Plan. This ruling has been made independently of what may be developed in the course of the Rule 56 motion that this Court understands is contemplated by Tredegar.

```
                            _____
                            Milton I. Shadur
                            Senior United States District Judge
```

Date: May 20, 2010