IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DALE C. GITTINGS,                    )
                                     )
              Plaintiff,             )
                                     )
         v.                          )    08 C 4972
                                     )
TREDEGAR CORPORATION,                )
TREDEGAR FIL PRODUCTS-LAKE           )
ZURICH, LLC; TREDEGAR                )
CORPORATION EMPLOYEE BENEFIT         )
PLAN, and SUN LIFE ASSURANCE         )
COMPANY OF CANADA,                   )
                                     )
              Defendants.            )

MEMORANDUM OPINION AND ORDER

After Dale Gittings ("Gittings") injured his knee in a
motorcycle accident on August 22, 2005 and underwent several
surgeries, he was still unable to perform certain physical
aspects of his job as Maintenance Supervisor at Tredegar Film
Products-Lake Zurich, LLC ("Tredegar").  On January 27, 2006
Gittings was fired by Tredegar after a company investigation had
revealed his attempt to use a corporate relationship with an
outside vendor to his personal advantage.  Gittings brings this
action against Tredegar, Tredegar Corporation and Tredegar
Corporation Employee Benefit Plan ("Plan"), alleging violations
of the Americans with Disabilities Act of 1990 ("ADA"), the Age
Discrimination in Employment Act ("ADEA") and the Employee
Retirement Income Security Act ("ERISA").

Tredegar has moved for summary judgment on Gittings'
employment claims under Fed. R. Civ. P. ("Rule") 56, and that

aspect of the case has been fully briefed. For the reasons explained below, the motion is granted and those claims are dismissed with prejudice. This Court retains jurisdiction, however, over Gittings' ERISA-based complaint against Plan stemming from the denial of his long-term disability claim, which had previously been remanded to Plan for reconsideration and further development of the administrative record.[1]

## Summary Judgment Standard

Every Rule 56 movant bears the burden of establishing[2] the absence of any genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir.

---

[1] Just a few words about the proper corporate defendant. Tredegar Film Products-Lake Zurich, LLC is a wholly-owned subsidiary of Tredegar Film Products Corporation ("Tredegar Film"), which is in turn a wholly-owned subsidiary of Tredegar Corporation. Gittings' Amended Complaint named as defendants Tredegar Corporation (the parent of the parent) in addition to Tredegar Film Products-Lake Zurich, LLC (the subsidiary of the subsidiary), leaving out the middleman Tredegar Film. On April 16, 2010 this Court denied Gittings' motion to file a Second Amended Complaint to add that middleman as a defendant. In denying that motion this Court remarked that any Tredegar Film employee had "truly minimal involvement" in Gittings' termination. That same logic applies with even greater force to Tredegar Corporation, which is dismissed as a defendant.

[2] At the summary judgment stage, of course, Gittings need not "establish" or "show" or "prove" anything, but must merely demonstrate that a genuine issue of material fact exists. This opinion employs those terms only because the cited cases use that terminology, but it imposes on Gittings the lesser burden described earlier in this footnote.

2002)).  But a nonmovant must produce more than "a mere scintilla
of evidence" to support the position that a genuine issue of
material fact exists (<u>Wheeler v. Lawson</u>, 539 F.3d 629, 634 (7th
Cir. 2008)) and "must come forward with specific facts
demonstrating that there is a genuine issue for trial" (<u>id.</u>).

   Ultimately summary judgment is warranted only if a
reasonable jury could not return a verdict for the nonmovant
(<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).
What follows is a summary of the facts,[3] viewed of course in the
light most favorable to nonmovant Gittings.[4]

### Factual Background

   In 1972 Gittings began working for Tredegar's predecessor
firm as a technician in its Lake Zurich, Illinois plastic
manufacturing plant (G. St. ¶1).  On May 1, 2005 Gittings was
promoted to Maintenance Supervisor (T. St. ¶19).  Tredegar's
Manufacturing Manager Andy Poole ("Poole") and Plant Engineering

---

[3] This District Court's LR 56.1, adopted to implement Rule
56, requires parties to submit evidentiary statements and
responses to such statements to highlight which facts are
disputed and which facts are agreed upon.  This opinion cites to
Gittings' LR 56.1 statement as "G. St. ¶ -," to Tredegar's LR
56.1 statement as "T. St. ¶ -" and to the parties' appendices
submitted with their respective statements as "T. App." and "G.
App."  Where the opponent does not dispute a party's original
statement, this opinion cites only that original statement.

[4] On October 1, 2010 this Court denied the litigants'
dueling motions to strike declarations and other factual
submissions for asserted failures to comply with Rule 56(e)(1)
and LR 56.1(a)(3).  Such motions are pretty much a waste of time
and effort, because this Court is of course aware of the
applicable rules and will not consider noncomplying materials.

Manager Brian Varley ("Varley") were initially satisfied with Gittings' job performance as Maintenance Supervisor (G. St. ¶5).

After the motorcycle accident referred to at the outset of this opinion (T. St. ¶51), Gittings underwent arthroscopic surgery on September 9, 2005 and thereafter received short-term disability benefits (id. ¶51). Gittings went back to work on September 26, 2005, but pain and swelling in his knee soon forced him to return home (G. St. ¶11). On September 30, 2005 Gittings underwent a second procedure to treat an infection, after which he was placed on short-term disability for the next several weeks (T. St. ¶¶54, 55). No one at Tredegar told him that such a medical leave of absence was a problem (id. ¶55).

Gittings had a third procedure on October 12, 2005 to remove infected tissue from his knee (T. St. ¶56). Upon his return to work on November 9, Gittings used a walker and restricted himself to sedentary office work (id. ¶57; G. St. ¶15). On November 29, 2005 Gittings' doctor released him to work eight-hour days with written instructions not to climb any ladders and oral instructions of no lifting and no excessive walking (T. St. ¶59; G. St. ¶15). Gittings then worked eight-hour days, with some vacation mixed in, until his January 27, 2006 termination (T. St. ¶61).

During that period Gittings could not crouch, kneel, climb up stairs, sit for over half an hour without discomfort or walk his dog around the block (T. St. ¶69). Tredegar accommodated

4

Gittings by providing him with a designated parking spot closer
to the building, by having someone bring him his mail, by having
someone perform the physical duties of his job and by permitting
him to work light duty in his office (id. ¶62).  Gittings admits
that he made no request during that time frame that Tredegar did
not accommodate, nor did he perceive any animosity toward him on
account of his work restrictions or the accommodations (id. ¶63).
Nonetheless Gittings says that he discussed certain
accommodations with Varley that were never put into effect,
including the use of the freight elevator and the availability of
a golf cart to drive around the plant floor (G. St. ¶20).

     On January 17, 2006 Gittings told Varley that he planned to
undergo a knee replacement operation (G. St. ¶16).  Gittings
believes that Varley gave him a look in response signifying
displeasure, but he admits that Varley did not say anything to
that effect (T. St. ¶65).  After that conversation Gittings felt
that Varley gave him the "cold shoulder" (G. St. ¶17).  Varley
also closed out three of Gittings' completed maintenance
projects, which was the first time in Gittings' tenure at
Tredegar that he did not personally close out his own projects
(id.).  Gittings was terminated just ten days later -- on January
27 (T. St. ¶46).

     Tredegar's stated reason for the termination relates to
events that began in late October 2005, about two months after
Gittings' accident.  Part of Gittings' duties was to order

supplies from vendors, and one of those vendors was W.W. Grainger ("Grainger") (T. St. ¶21). While recuperating at home from his injury Gittings placed an order on Grainger's website through his own personal business for a part for his home furnace (G. St. ¶22). When the part was not delivered on time, he called Grainger to complain, and Grainger representative Al Lazzara ("Lazarra") told him that the order was not processed because Grainger could not verify his personal business (T. St. ¶23).

There is a significant dispute over what Gittings said during that phone call. Gittings maintains that he told Lazzara to cancel his order and also to cancel his personal account, but not Tredegar's corporate accounts (G. St. ¶¶24, 25). Lazzara, for his part, says that Gittings told him to cancel not only his personal account but also the Tredegar accounts (T. St. ¶25). Lazzara testified that when he said that Gittings did not have authority to cancel Tredegar's accounts, Gittings became even more upset and hung up (id. ¶27).

Lazzara relayed the conversation to his supervisor, who in turn got in touch with Tredegar's Purchasing Coordinator Carol Gillespie ("Gillespie") to inquire whether all Tredegar accounts should indeed be canceled (T. St. ¶¶28, 29). Poole got word of the situation from Gillespie and arranged a conference call between Tredegar and Grainger representatives, during which Lazzara reiterated his position that Gittings had become irate and instructed him to cancel all the Tredegar accounts (id. ¶30,

31).  Poole then spoke with Phil Rapp ("Rapp"), Tredegar Film's
Human Resources Manager based in Virginia, and they decided that
Gittings should be asked to provide a statement describing what
had happened (id. ¶33).

Gittings wrote in his statement that he "was very upset at
this time and asked the representative to cancel the order,
refund my credit card, and cancel my account with Grainger ... "
(T. App. Tab D24).  Gittings also provided a follow-up statement
to clarify that he had not attempted to use a Tredegar credit
card to make what was a personal purchase (T. St. ¶39).

Poole then spoke again with Lazarra and his supervisor, and
he came away from that phone call convinced that Lazarra's
description of the call was accurate (id. ¶41).  Poole also spoke
separately with Lazarra's supervisor, who told him that Lazarra
was held in high esteem at Grainger (id. ¶42).  Poole then
summarized his findings in an e-mail to Rapp and to Tredegar
Film's Director of Operations Mike Jaros ("Jaros") in Virginia
(id. ¶44).  Poole recommended terminating Gittings for attempting
to cancel Tredegar's corporate accounts and for being less than
forthright in the ensuing investigation--actions that Poole
believed amounted to violations of Tredegar's Code of Conduct
(id.).

At a January 18, 2006 meeting Poole, Feuerbacher, Rapp and
Jaros decided to terminate Gittings' employment (T. St. ¶45).  As
indicated earlier, Feuerbacher and Varley informed Gittings of

that decision on January 27 (id. ¶46).  At that time Gittings was
given a letter signed by Poole explaining that the reason for
termination was "lack of candor during the investigation and
reluctance to accept responsibility for your actions . . ." (id.;
T. App. Tab D26).  Poole's letter went on to state, "I no longer
have confidence in your ability to make purchasing decisions in
the best interests of the Company" (id.).  Gittings was also
given a standard form entitled "Employee Declaration of No
Pending Disability Claims," which he refused to sign (T. St.
¶47.)  Gittings' position of Maintenance Supervisor was filled by
Steve Lyons, who is three years younger than Gittings (id. ¶48;
G. App. Ex. 18).

      Gittings applied for long-term disability benefits in June
2006 from Tredegar's Plan Administrator, Sun Life Assurance
Company of Canada ("Sun Life") (G. St. ¶39).  Tredegar, in
completing the employer's statement for disability benefits,
denied that it had knowledge of Gittings' disability at the time
of termination and omitted certain attendance records for periods
in which Gittings had taken medical leave (id.).  Plan denied
Gittings' claim on July 25, 2006 and again on March 2, 2007
following Gittings' appeal (Admin. R. 155-56, 210-13, found at
Dkt. No. 52).

      In November 2006 Gittings applied for Social Security
Disability Insurance ("SS Disability") benefits from the Social
Security Administration ("SSA") (T. St. ¶73).  SSA awarded

Gittings those  benefits, retroactive to February 2006 (id. ¶76).

Gittings filed this action against Tredegar, Plan and Sun Life on September 2, 2008, alleging violations of ADA, ADEA and ERISA.  This Court issued a sua sponte order on November 10, 2008 questioning the propriety of bringing an ERISA claim against Sun Life.  Gittings then filed an Amended Complaint on November 26, 2008 in which he dropped Sun Life from all but Count VII, a claim for breach of fiduciary duty under ERISA.[5]

On April 6, 2010 Gittings requested leave to file a Second Amended Complaint adding Tredegar Film as a defendant.  This Court denied such leave on the ground that Tredegar Film had at best minimal involvement in Gittings' termination.  On May 20 Plan's motion for judgment on the administrative record as to ERISA Count VI was denied, and that matter was remanded to Plan to make a more adequate assessment of whether Gittings was eligible to submit a benefits claim.  Tredegar brought the current motion for summary judgment--related only to Gittings' employment claims--on June 22.

### Giddings' Claims of Employment Discrimination

#### Judicial Estoppel

Before reaching the merits of Gittings' claims, this Court begins with a threshold issue: judicial estoppel.  Tredegar urges that Gittings is judicially estopped from asserting his ADA and

---

[5]     That count was later dropped, and Sun Life is no longer a party.

ADEA claims because essential elements of those claims are contradicted by representations be made in his successful SSA application. More specifically, Tredegar points to seemingly blanket statements in that application about his inability to work that, in its estimation, establish (1) that Gittings is not a qualified individual with a disability--that is, one capable of performing the "essential functions" of his job "with or without reasonable accommodation" (42 U.S.C. § 12111(8)[6])--so that he is estopped from bringing a claim under ADA and (2) that he could not have met his employer's legitimate job expectations, thus negating an element of an ADEA claim brought under the indirect method of proof (see <u>Johnson v. ExxonMobil Corp.</u>, 426 F.3d 887, 892-93 (7th Cir. 2005)).[7] This Court finds that Gittings' ADA claims are <u>not</u> barred, but his ADEA claim is.

Courts do not apply a special negative presumption against plaintiffs bringing ADA or ADEA claims after having been awarded SS Disability benefits, (<u>Cleveland v. Policy Mgmt. Sys. Corp.</u>, 526 U.S. 795, 802-03 (1999)), but the burden falls on the plaintiff to explain how the claims may coexist.[8] For example,

---

[6] All further reference to Title 42 provisions will simply take the form "Section --," omitting the prefatory "42 U.S.C."

[7] Gittings admits that he has no direct evidence of age discrimination and thus chooses to advance his ADEA claim under the indirect method of proof.

[8] Contradictions between applications for ERISA plan benefits and ADA claims are "no more acceptable" than those between SS Disability applications and ADA claims (<u>Opsteen v.</u>

an acceptable explanation may focus on the divergence between the

definitions of "disability" under ADA and under Social Security

regulations, because ADA takes into account reasonable

accommodation while the SSA does not (id. at 803).  To determine

whether Gittings has met that burden as to his ADA claim, this

Court employs the methodology set out in Cleveland, 526 U.S. at

807:

> To defeat summary judgment,[plaintiff's] explanation
> must be sufficient to warrant a reasonable juror's
> concluding that, assuming the truth of, or the
> plaintiff's good-faith belief in, the earlier
> statement, the plaintiff could nonetheless "perform the
> essential functions" of her job, with or without
> "reasonable accommodation."

Gittings argues that despite some of the statements in his

SS Disability application,[9] he is still a qualified individual

with a disability under ADA because he could perform the

essential functions of his Tredegar job only after numerous

accommodations, such as a designated parking space closer to

work, a restriction to light-duty work and the assistance of a

colleague who performed the physical aspects of the job.  Without

_____

Keller Structures, Inc., 408 F.3d 390, 392 (7th Cir. 2005).  But
Tredegar has not discussed Gittings' ERISA application in this
context and therefore has forfeited any reliance on statements
made in that application for purposes of determining whether
judicial estoppel bars Gittings' claims.

[9] Those include the following:  "I was unable to ever go
back to my full time job as a maintenance supervisor and there
were no other jobs that I was qualified for so I was terminated";
"I was unable to perform my job functions as required"; "From
11/17/05 to 1/27/06 I worked part time at a light duty job"; and
"I am incapable of employment in any line of work . . . ." (T. App.
Tab N, Ex. 1).

those accommodations, Gittings contends, he was unable to work, and therefore his statements to the SSA, which were made without reference to accommodation, do not bar his ADA claim.

Although it is a close question, this Court sides with Gittings. Gittings told the SSA that after his accident he could no longer perform the physical aspects of his job as Maintenance Supervisor and was terminated as a result. That statement is consistent with his ADA claim that Tredegar terminated him because of his disability, despite the fact that he could perform the essential functions of his job with reasonable accommodation. Hence his explanation hinges on the divergent definitions of "disability" under the two schemes, which is exactly the type of explanation approved in Cleveland, 526 U.S. at 803 and in later Seventh Circuit cases (see, e.g., Lee v. City of Salem, 259 F.3d 667, 674-75 (7th Cir. 2001); Feldman v. Am. Mem'l Life Ins. Co., 196 F.3d 783, 790 (7th Cir. 1999)).[10]

Gittings is not so fortunate when it comes to judicial estoppel of his ADEA claim. There the ability to explain apparently contradictory SS Disability and ADEA claims "is even

_____

[10] Gittings's statement in his SS Disability application that he was "incapable of employment in any line of work" comes closest to barring his ADA claim. That statement was made, however, in the context of his stated inability to perform the physical demands of a job that he believed required him to stand 50% of the time (G. App. Tab N, Ex. 1). In considering Gittings' statements to the SSA as a whole, a reasonable juror could conclude that Gittings was referring to "any line of work" that required physical duties he could not perform, rather than a light-duty desk job in which his employer provided significant accommodation for his injury.

12

harder to meet than that of the ADA" because an age discrimination claim is made without reference to reasonable accommodation (<u>Johnson</u>, 426 F.3d at 892-93). Here Gittings has completely neglected to explain how his ADEA claim may coexist with his SS Disability statements. In fact, Gittings' reply brief does not even mention ADEA in the section dedicated to judicial estoppel. This Court will not make his arguments for him.

After all, arguments made under ADA and ADEA in this context are not fungible. Gittings' explanation of how he was performing the essential functions of his job does not in itself explain how he was meeting Tredegar's legitimate expectations for ADEA purposes. Even if Gittings were to be viewed as meeting Tredegar's expectations despite his physical limitations, that is beside the point. Again the burden is his to square the seemingly contradictory assertions, and he has fallen far short of discharging that burden.[11] Consequently Gittings is judicially estopped from bringing his ADEA claim, which is therefore dismissed.[12]

---

[11] Moreover, Gittings' ADEA claim also fails as a matter of law for a plethora of reasons. Gittings' replacement was only three years younger (see <u>Hartley v. Wis. Bell, Inc.</u>, 124 F.3d 887, 892-93 (7th Cir. 1997)), he has offered no evidence that his age was even considered as a factor in his termination and, as will later become clear, Tredegar has provided a legitimate, nondiscriminatory reason for the termination.

[12] Tredegar remarks in its initial brief that Gittings' SS Disability application also bars his ERISA claim. Tredegar does not elaborate further on that concept, however, and it does not

**ADA Claims**

ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to ... terms, conditions, and privileges of employment" (Section 12112(a)). "Qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires" (Section 12111(8)). Gittings advances three contentions under ADA: discrimination, denial of reasonable accommodation and retaliation.

As for the first of those, Gittings has chosen to establish his claim of discrimination under the direct method of proof.[13] To do so Gittings must present evidence that (1) he is disabled within the meaning of ADA, (2) he is otherwise qualified to

_____

mention ERISA at all in the section of its reply brief relating to estoppel. Accordingly Tredegar has forfeited that argument. As United States v. Useni, 516 F.3d 634, 658 (7th Cir. 2008) has reiterated (employing the common but imprecise reference to "waiver" rather than "forfeiture")

> We have repeatedly warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.

[13] G. Mem. 4 makes the puzzling assertion that an ADA discrimination claim can be examined only under the direct method of proof, and not under the indirect method set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). That is of course wrong -- see, e.g., Lloyd v. Swifty Transp., Inc., 552 F.3d 594, 601 (7th Cir. 2009). But no matter--this opinion takes Gittings' abandonment of the burden-shifting method at face value.

14

perform the essential functions of the job with or without
reasonable accommodation and (3) Tredegar took an adverse job
action against him because of his disability (<u>Winsley v. Cook
County</u>, 563 F.3d 598, 603 (7th Cir. 2009)).  There is of course
no question about the adverse job action, so that the parties
lock horns on all of the other components.

First, disability for the ADA purposes is defined as "(A) a
physical or mental impairment that substantially limits one or
more of the major life activities of such individual; (B) a
record of such an impairment; or (C) being regarded as having
such an impairment" (Section 12102(2)).  Gittings claims that he
is disabled in those terms because he has great difficulty
lifting, sitting and walking, and he is unable to kneel, climb or
stoop.  In March 2006 Gittings wrote a letter in which he stated
that at the time of termination he was unable to sit for half an
hour without severe pain, walk his dog around the block, lift
over 20 pounds or mow his lawn with a push mower (T. St. ¶69).[14]

Tredegar responds that Gittings is not disabled within the
meaning of ADA because his knee injury is temporary in nature
(see <u>Ogborn v. United Food & Commercial Workers Union, Local No.
881</u>, 305 F.3d 763, 767 (7th Cir. 2002)).  Tredegar views

---

[14] Although that letter postdated Gitting's termination, he
said in his deposition that the letter accurately described his
physical condition at the time of termination.  Tredegar has
accepted those statements as an accurate reflection of Gittings'
physical abilities as of January 27, 2006, the date of his firing
(T. St. ¶69).

Gittings' injury as merely an intermittent impairment, much like a broken leg, that could be corrected with surgery (see <u>Vande Zande v. Wis. Dep't of Admin.</u>, 44 F.3d 538, 543-44 (7th Cir. 1995); <u>Evans v. City of Dallas</u>, 861 F.2d 846, 852-53 (5th Cir. 1988)).

Tredegar's argument has much to commend it. But even if that position is rejected and the injury is characterized as permanent, Gittings would still have difficulty establishing that it is severe enough to constitute a substantial limitation on a major life activity (Section 12102(2)).[15] That issue need not be resolved, though, because Gittings plainly fails the third element of a direct-evidence claim of ADA discrimination: Even with the benefit of reasonable inferences in his favor, as Rule 56 requires, he does not establish that Tredegar terminated him <u>because of</u> his alleged disability.

Gittings offers no material evidence -- either direct or circumstantial--that Tredegar was motivated to fire him because of his knee injury or his potential knee replacement surgery. Indeed, the record paints precisely the opposite picture: that

---

[15]  Whether an individual is disabled for ADA purposes is a fact-intensive inquiry, made on a case-by-case basis. Gittings does precious little to facilitate that inquiry by his way of identifying <u>which</u> major life activities have been substantially limited and to link those activities to relevant caselaw. For example, Gittings does not make clear whether the major life activity is walking, working, performing manual tasks or some other combination of impacted activities hitherto unrecognized as a disability under ADA. Tredegar, for its part, is also unhelpful on that question, for it simply rests on the argument that the knee injury was temporary.

Tredegar never harbored any animosity toward Gittings due to his injury from the time of his accident until his termination. That lack of animus is especially telling in light of the numerous accommodations that Tredegar provided to Gittings.

In attempted support for his disability discrimination theory, Gittings relies heavily--and nearly exclusively--on a January 17, 2006 conversation with Varley in which Gittings took Varley's facial expression to mean that he was displeased with the prospect of a knee replacement. After that conversation, according to Gittings, Varley gave him the "cold shoulder" and closed out three of his completed maintenance projects.

Those allegations, taken as true for present purposes, fall far short of creating a genuine issue of material fact as to whether Gittings was terminated because of his disability. Purely subjective characterizations of a facial expression and an ensuing "cold shoulder" do not an ADA discrimination claim make. And the fact that Varley closed out three of Gittings' projects that were already completed hardly qualifies as evidence of discrimination.

Gittings also cites as purported evidence of discrimination his belief that Tredegar's stated reason for terminating him was pretextual. Again a subjective belief that Tredegar's stated reason for firing him was a sham cannot substitute for the need to offer up direct or circumstantial evidence that Gittings was terminated due to his alleged disability. Moreover, Gittings'

pretext argument is particularly infelicitous, given the thoroughness of the over-two-month investigation that culminated in his termination.

In short, Gittings has failed to establish a genuine issue of material fact to suggest that Tredegar fired him because of his disability. So Gittings' disability discrimination claim must be and is dismissed as well.

**Failure To Accommodate**

Gittings' ADA-based failure-to-accommodate claim is hard to fathom. On that score he makes the remarkable assertion that Tredegar failed to provide a "reasonable accommodation" (Section 12111(9)) of continued employment as such, although he admits that he had received numerous other accommodations.[16] Termination itself is a failure to accommodate, Gittings argues, because his disability motivated Tredegar to fire him.

It distorts the concept of reasonable accommodation beyond all recognition to suggest that if an employee simply requests continued employment, the denial of that request--in the form of a termination--may form the basis of an accommodation claim. Requests for continued employment (a concept that does not roll

_____

[16] Pressed at his deposition to identify a request for accommodation that Tredegar had rejected, Gittings pointed only to vague discussions with Varley regarding the use of a freight elevator and a golf cart (G. St. ¶20). Gittings does not mention those items, however, in his response to Tredegar's summary judgment motion, and this Court accordingly disregards them. In any event, it appears that these discussions never translated into actual requests for accommodation.

18

easily off the tongue, surely due to its patent absurdity) come nowhere near the statutory examples of "reasonable accommodation,"[17] and Gittings has (unsurprisingly) provided no caselaw supporting that proposition. Once again Gittings' theory of recovery bites the dust.

**ADA Retaliation**

Gittings next contends that Tredegar retaliated against him for requesting reasonable accommodation following his knee injury. For that purpose he has chosen to proceed under the direct method of proof, which requires that he provide evidence of (1) engagement in a statutorily protected activity, (2) an adverse employment action and (3) a causal connection between the two (Turner v. The Saloon, Ltd., 595 F.3d 679, 690 (7th Cir. 2010)).

With the first two elements clearly satisfied, only the third element--causation--is contested. At the outset the parties disagree as to when the protected activity occurred for

---

[17] Section 12111(9) defines "reasonable accommodation" to include:

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

purposes of causation. Tredegar focuses on Gittings' initial
request for disability leave in early September 2005, so that
nearly five months elapsed between the activity and the adverse
action on January 27, 2006. Gittings would shorten that gap to
just ten days by placing the protected activity on January 17,
2006, the date he informed Varley that he was going to begin
preparations for a knee replacement. But that temporal
difference in approach makes no difference: Under either timeline
Gittings fails to establish any causal connection between his
request for accommodation and his termination.

"Suspicious timing alone rarely is sufficient to create a
triable issue" (<u>Tomanovich v. City of Indianapolis</u>, 457 F.3d 656,
665 (7th Cir. 2006)), and no evidence suggests that the timing
here was even suspicious, much less sufficient to establish a
genuine issue of material fact. Gittings' conversation with
Varley on January 17, 2006 was the last in a series of
communications about disability leave and workplace accommodation
that began in September 2005. Gittings concedes that during that
period no one at Tredegar harbored animosity toward him due to
his injury. Again the only hint of discriminatory animus that
Gittings can offer--and it is really a stretch to label it as
"evidence"--is his impression that Varley was displeased with the
prospect of him undergoing a knee replacement. Just as stray
remarks are insufficient to create a triable issue (<u>Petts v.
Rockledge Furniture LLC</u>, 534 F.3d 715, 721 (7th Cir. 2008)), the

same conclusion flows a fortiori from a single self-perceived facial expression.

Instead the only reasonable conclusion to be drawn from the record is that Tredegar terminated Gittings because of his dealings with Grainger. Tredegar's investigation into the Grainger situation began in early November 2005, and Gittings provided Varley with statements about the incident on December 12, 2005 and January 11, 2006. Gittings' termination on January 27 was the culmination of that months-long investigation. No fewer than eight people--seven from Tredegar and one from Grainger--have confirmed that timeline, and Gittings' attempts to characterize those events as a massive coverup founder dismally. Because Gittings show no causal link between his perceived disability and his termination, his ADA retaliation claim must be dismissed as well.

**ERISA Claim**

Seemingly indefatigable,, Gittings also asserts that Tredegar terminated him to prevent him from taking advantage of Tredegar's welfare, pension and health benefit programs.[18] U.S.C. § 1140 makes it "unlawful for any person to discharge ... a participant ... for the purpose of interfering with the

---

[18] Tredegar's motion for summary judgment reads as if Gittings has raised a retaliation claim under ERISA. Gittings' Complaint and his opposition to the summary judgment motion make if clear, however, that he is claiming that Tredegar terminated him to deprive him of benefits. In other words, he is bringing an interference claim, not a retaliation claim.

attainment of any right to which such participant may become entitled ...." To come under that rubric Gittings must demonstrate that Tredegar terminated him with the "specific intent of preventing him from obtaining his full pension benefit" (<u>Lindemann v. Mobil Oil Corp.</u>, 141 F.3d 290, 295 (7th Cir. 1998)).

Once again that effort can be made under either the direct or indirect method. Here Gittings chooses the latter, which requires a prima facie showing that he "(1) belong[ ] to the protected class; (2) [be] qualified for [his] job position; and (3) [be] discharged or denied employment under circumstances that provide some basis for believing that the prohibited intent to retaliate or to prevent the use of benefits was present" (<u>Isbell v. Allstate Ins. Co.</u>, 418 F.3d 788, 796 (7th Cir. 2005)).

But <u>Lindemann</u>, 141 F.3d at 296 teaches a short cut:

> "However, it is unnecessary for this Court to determine whether a plaintiff has established a prima facie case where a defendant has advanced a legitimate, nondiscriminatory reason for its action."

That is certainly the case here, given Tredegar's showing of violations of its company Code of Conduct in Gittings' dealings with Grainger and his subsequent conduct during Tredegar's on seeing investigation. So there is no need to determine whether Gittings has established a prima facie case.

Thus Gittings once again finds himself butting up against the need to show that Tredegar's stated reason is a pretext (<u>Everroad v. Scott Truck Sys., Inc.</u>, 604 F.3d 471, 477 (7th Cir.

2010)).  This time he asserts that Tredegar failed to provide
Plan Administrator Sun Life with complete and truthful
information regarding his post-termination application for long-
term disability.

But that post-termination evidence does not support a claim
of pretext for discrimination.  Tredegar sent the disability form
to Sun Life almost six months <u>after</u> Gittings' termination.  That
does not reasonably create any implication that Tredegar relied
on, or even considered, his post-termination disability claim in
its termination decision (see, e.g., <u>Lindemann</u>, 141 F.3d at 296).
Whatever shortcomings may arguably have existed in the document
submitted by Tredegar to Sun Life, they are too attenuated from
the termination itself to establish that Tredegar fired Gittings
in anticipation of (and to frustrate) a long-term disability
claim.

More relevant are actions taken <u>before</u> the termination,
including the fact that Tredegar provided Gittings with short-
term disability leave and, as both sides agree, harbored no
animosity toward Gittings for taking advantage of that benefit.[19]
Gittings has therefore failed to establish a prohibited intent.
Because once again no genuine issue of material fact exists,

---

[19]  Gittings also claims that upon his termination he was
asked (but refused) to sign a form entitled "Employee Declaration
of No Pending Disability Claims."  But the record establishes
that Declaration is a standard form given to all Tredegar
employees upon separation (T. St. 47), and so it is not evidence
of any specific intent to deprive Gittings of disability
benefits.

Tredegar's summary judgment motion as to Gittings' ERISA claim is granted as well, and that claim too is dismissed.

## Conclusion

What been said here -- at regrettable length -- is that Gittings has failed utterly to identify any material factual issue that would stave off summary judgment. Tredegar's Rule 56 is granted as to Gittings' employment claims, all of which are dismissed with prejudice. Moreover, Tredegar Corporation (Tredegar's parent) is also dismissed as a defendant. Final judgment is ordered to be entered as to such dismissals, for this Court expressly determines pursuant to Rule 54(b) that there is no just reason for delay.

At this point, then, all that remains of this lawsuit is the previously remanded ERISA-based claim against the Plan. This action is set for a status hearing at 9 a.m. December 13, 2010 to discuss the conduct and timing of further proceedings.

_____
Milton I. Shadur
Senior United States District Judge

Dated:    November 29, 2010