UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DALE C. GITTINGS, | ) | |
| Plaintiff, | ) | Case No. 08 C 4972 |
| | ) | |
| v. | ) | |
| | ) | **Judge Milton I. Shadur** |
| TREDEGAR CORPORATION; | ) | |
| TREDEGAR FILM PRODUCTS - LAKE | ) | **Magistrate Judge Schenkier** |
| ZURICH, LLC; TREDEGAR | ) | |
| CORPORATION EMPLOYEE BENEFIT | ) | |
| PLAN, and SUN LIFE ASSURANCE | ) | |
| COMPANY OF CANADA, | ) | |
| Defendants. | ) | |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO RULE 52 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

Plaintiff, DALE C. GITTINGS, through his attorneys JOHN C. KREAMER and SUSAN J. BEST of BEST, VANDERLAAN & HARRINGTON, for his proposed findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, states as follows:

**Background on Sun Life's Denials of Plaintiff's Benefit Claims**

On July 25, 2006, Sun Life denied Plaintiff's claim stating that Plaintiff was working full time up until his termination and therefore was not eligible for Long Term Disability Benefits. SUN 156. Plaintiff appealed Sun Life's denial, explaining in his appeal letter that he was performing light duty and office work and that he was not performing the regular duties of his job in the weeks leading up to his termination. Therefore he met the definition of "Totally Disabled" before he was terminated. SUN 159-160.

On March 2, 2007, Sun Life upheld its denial again stating that Plaintiff was not eligible for coverage under the Long Term Disability policy because he was working full-time as of the date of his termination. SUN 210-213. The decision went on to state that because Plaintiff received his full paychecks through the date of his termination, he was able to perform all the material and substantial duties of his occupation. SUN 212.

1

On February 12, 2010, Plaintiff appealed Sun Life's second denial of his claims to this court pursuant to Rule 52. This Court ordered that the matter be remanded to the Plan for reconsideration on Plaintiff's eligibility for long term disability benefits on May 20, 2010. SUN 241.

On January 20, 2011, Sun Life denied Plaintiff's long term disability benefits for the third time. SUN 1969. The decision stated that Gittings was not Totally Disabled as defined in the policy at the time of his termination. Further, Sun Life classifies Plaintiff's maintenance supervisor as "light occupation." SUN 1988. Sun Life again fails to consider the fact that Plaintiff was unable to perform the physical duties of his position as Maintenance Supervisor and remained on "light duty" until he was terminated. SUN 3430.

On April 11, 2011, Plaintiff agreed to waive his right to an internal administrative appeal and Sun Life agreed to waive its failure to exhaust defense relating to Plaintiff's decision to forego the administrative appeal. With this Court's permission, the parties have again agreed to resolve Plaintiff's ERISA claims pursuant to Federal Rule 52.

## Standard of Review

Just as this Court found in its previous decision rendered on May 20, 2010, the applicable standard of review is *de novo*. SUN 247. This Court stated:

> It is not disputed that Plan is an "employee welfare benefit plan" as defined by Section 1001 (1)(A) and that Gittings is entitled to judicial review of Plan's final decision. Under the seminal teaching of *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), any such review is *de novo* unless Plan has reserved discretion to its administrator to determine when benefits are due or to interpret Plan provisions, in which event the court examines the record only to ensure that the decisions was not arbitrary and capricious (id. 109-11). SUN 246.

Here, the Plan has not reserved discretion to its administrator to determine when benefits are due or to interpret Plan provisions.

Further, this Court considered the decision of *Herzberger v. Standard Ins. Co*.,, 205 F. 3d 327 (7th Cir. 2000), and noted the binding effect of said decision. As quoted in this Court's opinion, the Herzberger's Court stated:

> We hold that the mere fact a plan…requires proof or satisfactory proof of the applicant's claims…does not give the employee adequate notice that the plan administrator is to make a judgment largely insulated from judicial review by reasons of being discretionary.

This Court used the reasoning in Herzberger and *Diaz v. Prudential Ins. Co. of Am.,* 424 F.3d 635, 639-40 (7th Cir. 2005), to determine that de novo review applied to Gittings case. Specifically, this court compared the language in *Diaz* to the language in Sun Life's policy. *Diaz* dealt with language requiring "proof of continuing disability, satisfactory to Prudential, indicating that [the claimant is] under the regular care of a doctor." Here, the only language contained in Plan approaching this subject is the following: "Proof [of LTD] must be satisfactory to Sun Life." SUN 32. That unelaborated use of "satisfactory" is present here as well. This Court, in its May 20, 2010, opinion followed *Diaz* in finding that language insufficient to trigger deferential review, for it gives no clue as to what would suffice as "satisfactory" proof or as to whether Plan "has the power to re-define the entire concept of disability...on a case-by- case basis" (Diaz I, 424 F.3d at 639). Hence *de novo* review is appropriate.

## PROPOSED FINDINGS OF FACT
### I. Significant Plan Provisions

For and in consideration of premiums paid, Sun Life issued a policy of disability income insurance providing for payment of monthly benefits in the event a Tredegar employee becomes totally or partially disabled. SUN 16. The Plan defines "eligible classes" for benefits under the Plan as follows: "All full-time Employees; Working a minimum of 30 hours per week." SUN 4.

The Plan uses the following definition to determine "totally disabled:"

> **Total Disability** or **Totally Disabled** means during the Elimination Period and the next 24 months, the Employee, because of Injury or Sickness, is unable to perform ***all of the material and substantial duties of his own occupation***. After benefits have been paid for 24 months, the Employee will continue to be Totally Disabled if he is ***unable to perform all of the material and substantial duties of any occupation for which he is or becomes reasonably qualified for by education, training or experience.*** (***Emphasis added***)
> …
> To qualify for benefits, the Employee must satisfy the Elimination Period with the required number of days of Total Disability, Partial Disability or a combination of Total or Partial days of Disability. SUN 13.

The Plan defines the "Elimination Period" as follows:

> **Elimination Period** means a period of continuous days of Total or Partial disability for which no LTD Benefit is payable. The Elimination Period is shown in Section I, Schedule of Benefits and begins on the first day of Total or Partial Disability.

3

If the Employee returns to work for 15 working days or less during the Elimination Period and cannot continue working, the Total or Partial Disability will be treated as continuous. Only those days that the Employee is Totally or Partially Disabled will count toward satisfying the Elimination Period. SUN 10.

The Plan defines "Actively at Work" as follows:

Actively at Work means that an Employee performs all the regular duties of his job for a full work day scheduled by the Employer at the Employer's normal place of business or a site where the Employer's business requires the Employee to travel.

An Employee is considered Actively at Work on any day that is not his regular scheduled work day (i.e., vacation, layoff, or an approved leave of absence), if the Employee:
- is not hospital confined; or
- is not disabled due to an injury or sickness; and
- was Actively at Work on his immediately preceding scheduled work day. … SUN 8.

An Employee's insurance under the Plan is terminated when:

An Employee will cease to be insured on the earliest of the following dates:
1. the date this Policy terminates;
2. the date the Employee is no longer in an Eligible Class;
3. the date the Employee's Class is no longer included for insurance;
4. the last day any required premium has been made;
5. the date the Employee retires;
6. the date employment terminates. Cessation of Actively at Work will be deemed termination of employment, except:
   a. insurance will be continued for an Employee absent due to a disability during:
      i. the Elimination Period; and
      ii. any period the premium is waived under this Policy.

The Policyholder in all of the above situations must act so as not to discriminate unfairly among Employees in similar situations.
SUN 26.

According to the Plan, Plaintiff's monthly benefit amount is the Employee's Total Monthly Earnings multiplied by the Benefit Percentage less Other Income Benefits. SUN 16. Other Income Benefits include disability benefits under the United States Social Security Act. SUN 18-19. Plaintiff's monthly Benefit Percentage is 70 %. SUN 100-102. Plaintiff was Totally disabled for a continuous period of 6 months.

## II. Plaintiff's Disability

On August 22, 2005, Plaintiff was severely injured in a motorcycle accident. SUN 135. On August 23, 2005, he began seeing Dr. Marko Krpan, whose specialty is orthopedic surgery, for treatment of his knee. SUN 462-463. On August 23, 2005, Dr. Krpan diagnosed Plaintiff with post-traumatic arthritis, right medial meniscus tear, and septic arthritis SUN 126; SUN 463. On September 9, 2005, Dr. Krpan performed an arthroscopy, partial medial meniscectomy, and chondroplasty of Plaintiff's right knee. SUN 371. Plaintiff developed complications due to a severe infection in his knee, and was forced to undergo a second surgery on September 30, 2005 and a third surgery on October 12, 2005. SUN 412 and 406.

When Plaintiff had his first surgery, he applied for Short Term Disability Benefits from his employer. SUN 135. Plaintiff received Short Term Disability from September 9, 2005 through November 2, 2005. SUN 105-106. Upon his return to work in early November 2005, Plaintiff was limited to light duty, and only a four hour work day. By the end of November, Gittings was permitted to work 8 hour days, but was limited to light duty work and physical restrictions. SUN 3430. Because of his knee problems, Plaintiff was never able to perform all of the material and substantial duties of his own occupation as maintenance supervisor. SUN 1973-76; 314; 304. When he returned to work in November, up until the time he was terminated on January 27, 2006, plaintiff performed light office work which had not been a normal function of his job prior to his accident.

On January 17, 2006, approximately a week before Plaintiff was terminated, Plaintiff's physician informed him that he would most likely require a total knee arthroscopy due to his injuries sustained on August 22, 2005. SUN 457. Plaintiff was terminated from his position as Maintenance Supervisor on January 27, 2006. SUN 114 and 88. On January 27, 2007, Plaintiff was still restricted to light duty, was still instructed to use a cane, still had physical restrictions in place, still on mediation for his injuries, and still suffering from severe pain. SUN 184; 304; 399; 445; and 3430. Plaintiff's material and substantial duties as Maintenance Supervisor were physically demanding. SUN 1973-1976. Plaintiff was unable to perform any of the required physical demands due to his injuries sustained in August 2005. *Id*. Thus, on January 27, 2006, plaintiff was totally disabled as defined by Sun Life's policy.

Plaintiff's knee has continued to deteriorate over time since August 22, 2005. Plaintiff has severe and permanent physical restrictions. SUN 126. Plaintiff suffers from severe pain, loss of motion, early fatigue, and limited walking. SUN 126. Further, Plaintiff is limited to one hour of standing and/or walking and 3-5 hours of sitting per day. SUN 127. Plaintiff cannot bend, squat, climb, twist his body, balance, kneel, or crawl at all. *Id.* His ability to push and pull is severely restricted. *Id.* Dr. Krpan indicated that Plaintiff would only be able to work even within these restrictions up to 2-3 hours per day. *Id.* Finally, Dr. Krpan limited Plaintiff to Class 4 employment, which is defined as "moderate limitation of functional capacity; capable of clerical/administrative activity." *Id.* Plaintiff's physical restrictions are permanent. SUN 128.

Despite the above, Sun Life claims that Plaintiff's condition was improving as of November 29, 2005, and that it wasn't until March 23, 2006, that his condition started to get worse. SUN 1987-88. Sun Life supports this position with Dr. Krpan's notes of November 29, 2005, January 17, 2006, and March 23, 2011. SUN 453; 457; and 452. On November 29, 2005, Gittings was instructed to still use a cane and diagnosis remained the same as it was prior to this date: "Septic arthritis, right knee, status post arthroscopy debridement," SUN 453. Further, on November 29, 2005, Dr. Krpan notes in Gittings' progress notes that he is in constant pain when walking. SUN 445. Gittings was at all times relevant taking pain medication to reduce the pain. SUN 399 and 453. On January 17, 2011, approximately a week before Gittings was terminated, Dr. Krpan advised Gittings that at some point he will require a total knee anthroplasty. SUN 457. On March 23, 2006, Gittings is **<u>again</u>** told that he will at some point require a total knee anthroplasty. SUN 452 (emphasis added). Despite the same recommendations from January and March, Sun Life takes the position it is not until March 23, 2006, that Gittings' condition starts to decrease. Sun Life's selective review of the record does not take away from the fact that Gittings was totally disabled, per its policy, at the time of termination.

### III. The Social Security Administration Declared Plaintiff Totally Disabled

In March 2007, Plaintiff was awarded Social Security Disability retroactive to the date of his accident on August 22, 2005, notably, five months prior to his termination. SUN 78 Disability under the Social Security Act is defined as "the inability to engage in *any* substantial activity." 42 U.S.C. §423(d)(1)(A) (emphasis added). By virtue of the Social Security award, Plaintiff was qualified to receive benefits in the amount of $2,050.00/month. SUN 3482.

6

Plaintiff's application for SSDI was supported by medical documentation. Dr. Krpan submitted a letter to SSA dated January 16, 2007. SUN 472-473. Dr. Krpan wrote:

> "I have discussed with Mr. Gittings that his disability is currently permanent….I do feel that Mr. Gittings has a significant limitation to where he would not be able to carry more than 10 pounds for more than 5 to 10 minutes, which would be the occasional basis for lifting. I do not feel that he would be able to carry anything on a frequent basis, nor would he be able to stand or walk more than 15 to 20 minutes at a time, and would have to rest for a (sic) least a period of 30 to 60 minutes between episodes. Sitting he would be able to do to his comfort. At this time he is using a cane for ambulation….He would not be able to perform pushing, pulling, bending or stooping at all." *Id*.

The SSA's medical consultant, Dr. Donald Riff, reviewed Dr. Krpan's assessment and agreed with his findings. SUN 488. Sun Life was provided with similar information from Dr. Krpan in support of Plaintiff's Long Term Disability Claim.

Plaintiff was also awarded SSDI benefits based on his work limitations. Gittings stated:

> Since my work always required me to stand and walk for more that 50% of my time, I was unable to perform job functions as required. Sitting for more than a couple of hours causes extreme pain and I must lie down and elevate my knee. Further I am on pain medication all the time….Severe pain in both knees require that I use medication that makes me drowsy and lightheaded and does not eliminate the pain. This affects my ability to concentrate and perform even the simplest of tasks. SUN 304.

Specifically regarding his job duties as a Maintenance Supervisor, Gittings stated:

> In my job function as a maintenance supervisor for a manufacturing facility it is required and in my job scope to be on my feet 50 % of the time. SUN 304. I supervised a 15 person maintenance department. Followed up on maintenance work orders. SUN 318. Walking through the plants to check equipment, Troubleshooting Designed equipment and process, did a lot of climbing, walking, kneeling that I can no longer do. *Id.* During the day, his job required 3 hours of walking, ½ hour of standing, 1 hour of sitting, ½ of stooping, ½ hour of kneeling, ½ crouching, ½ of crawling, ½ handling or grabbing big objects, and ½ hour typing or handling small objects. *Id*.

The information Gittings gave to Social Security is consistent with the information provided to Sun Life and Tredegar's job description of a Maintenance Supervisor. The fact that Social Security determined Plaintiff was disabled premised upon a stricter standard of disability (inability to engage in ***any*** substantial gainful activity) versus Sun Life's "own occupation" standard in the Plan, is evidence that Plaintiff's claim was improperly denied again.

## IV. Plaintiff's Job Duties

As described to SSDI and to Sun Life, Plaintiff's material and substantial duties as maintenance supervisor were physically demanding. SUN 304; 318; and 1973-1976. According to Plaintiff's job description, a maintenance supervisor is required to stand, particularly for a sustained period of time, 50% of the day; walk, particularly for long distances, 30% of the day; climb 5% of the day; stoop 5% of the day; crouch 5% of the day; balance for 2% of the day; crawl approximately every other day; reach for approximately 5% of the day; and kneel 1% of the day. SUN 110. As stated in the Attending Physician statement, Plaintiff was unable to climb, stoop, crouch, balance or kneel at all. Further, his ability to stand and walk was restricted to one hour per day. SUN 127. Plaintiff confirmed that after his accident on August 22, 2005, until he was terminated on January 27, 2006, he was unable to climb, balance, stoop, kneel, crouch, crawl, push, pull, or lift in his November 16, 2010, letter to Sun Life. SUN 1973-76. Further, it was extremely difficult for Plaintiff to walk and stand for even short periods of time (3 to 5 minutes) difficult to sit, and he was continuously on pain medication. *Id.* In considering the maintenance supervisor job description, submissions to SSDI, and submissions to Sun Life, it is clear that the material and substantial duties of a maintenance supervisor are physically demanding. Thus, Plaintiff was unable to perform all of the material and substantial duties of his own occupation at the time of termination.

Sun Life relies on Carl Feuerbacher, Human Resources Manager for Tredegar and Dave Johnson, Engineer at Tredger, to determine that Gittings was performing all of the material and substantial duties of a Maintenance Supervisor. This is despite the fact that Carl Feuerbacher and Dave Johnson never performed the material and substantial duties of a Maintenance Supervisor, and despite the fact that they never worked with Plaintiff. Carl Feuerbacher **almost never saw Gittings on the job** because "[Gittings] was in a whole other part of the building." SUN 1797 (emphasis added). Mr. Feuerbacher's only knowledge of what a Maintenance Supervisor does is based on Tredegar's job description of the same. SUN 1831. Yet, he somehow has the capacity to change the percentages allocated to each job requirement and reclassify the position to a "non-working supervisor," or a "light occupation." SUN 1984 and 1988. This is highly suspect. In May 2010, this Court made it clear that one of the main issues on remand would be plaintiff's job duties. From the beginning, Gittings has stated he returned to work on light duty and performed light office work. From the beginning, Gittings has stated that light office work was

not a normal function of his maintenance supervisor position. Now of course it is - according to Tredeger employees who have never held the position as maintenance supervisor nor observed Gittings perform the duties of his occupation as maintenance supervisor. Sun Life completely disregards Gittings descriptions of his occupation as maintenance supervisor, despite being the only person to have held the position. Further, Sun Life completely disregards the job description of a maintenance supervisor and blindly accepts Tredegar's obvious self-serving statements regarding Gittings' job in order to deny him his disability benefits again. Gittings continues to assert that at the time of termination he was unable to perform his job as a maintenance supervisor because all the material and substantial duties were physically demanding.

Prior to speaking with Sun Life during the remand, Mr. Feuerbacher described Gittings job as Maintenance Supervisor, in this way: Gittings had the "day-to-day responsibility to basically work, oversee that work, assist with equipment reliability issues, and also monitor -- monitor the employ – the work order system, when work orders went in to the system to kind of recap and maintain and monitor that whole system." SUN 1795. His job was to supervise "the actual guys who are doing the repairs on the equipment." *Id.* "His job did require him to be out on the production floor, to walk out on the production floor." SUN 1809. Mr. Feuerbacher also stated that some of the employees, who Gittings was required to supervise, maintained and/or repaired equipment that was very large in size; stories high and stories wide. SUN 1833-1834. As Gittings has described, maintenance supervisor required a lot of physical needs, especially walking and climbing because Tredegar had very large silos and other areas that required him to climb up on and into in order to check on people's work statuses and look at problems and diagnose issues. SUN 1787. Other high climbing areas included the top of rest and storage areas, on top of extruder equipment. 1787. Despite the above testimony by Mr. Feuerbacher, when Mr. Feuerbacher talked to Sun Life during the remand, the Maintenance Supervisor position became an office job, classified as a "non- working supervisor." SUN 1984 and 1988. The physical demands listed in the job description of the Maintenance Supervisor became non-existent and non essential functions of the job. SUN 1980-1981. This is disingenuous. The duties as described above could not have been completed without physical observation and inspection. Sun Life selectively adopted Feuerbacher's new classification for a maintenance supervisor and disregarded Gittings' consistent descriptions of his material and substantial duties as maintenance supervisor.

Gittings was not able to perform any of the physical demands of the job after his accident in August 2005, to the time of termination in January 2006. SUN 1973-1976. All of the essential duties cited to in Sun Life's denial letter require physical movement that Gittings was unable to perform due to his disability. It is unreasonable to conclude that an individual could perform those duties without walking, standing, climbing, crouching, stooping, and/or kneeling. In order to direct and guide the overall activities of the Department, including the preparation of the work lists, an individual would have to first determine what the problems were and what recourses would be needed. SUN 847. This would require the employee to physically look at the problem which required a lot of physical exertion and climbing because of the layout of the plant and the size and shape of the machines. Also, it is unreasonable to conclude that an individual could prepare a preventative maintenance plan without walking, standing, climbing, crouching, stooping, and/or kneeling. SUN 847. In order to perform this duty, the machines, at a minimum, would have to be inspected in order to determine what needed maintenance. This is common sense. If you were to take a car into the shop complaining of a noise it was making or that it was not working properly, a physical inspection would be required in order to determine what needs to be done. In order to prepare a preventative maintenance plan, the maintenance supervisor would be required to physically inspect the equipment. Further, it would be impossible for a maintenance supervisor to ensure that all employees had the proper skills to perform the work assigned without observing them do the work which requires direct interaction with the employee during a repair and working alongside of that individual to make sure they did the job right. SUN 847.

As Mr. Feuerbacher stated, Gittings supervised the actual guys who made the repairs on the equipment." To say this and at the same time state that all physical requirements listed in the job description are not essential, and simply "a choice" of the maintenance supervisor if performed is disingenuous and self serving. A brief review of a maintenance supervisor's summary of responsibilities further demonstrates the disingenuous nature of Feuerbacher and Sun Life's unreasonableness for adopting the same. The Summary states:

> Supervises all maintenance related activities of a plastic film extrusion plant. Responsible for the maintenance of all plant equipment, building and grounds, training of maintenance personnel, and handling of first line employee relation matters. Performs other duties as required to promote overall plant effectiveness. SUN 847.

It is clearly unreasonable to determine that a supervisor is able to supervise employees; meet with them; help them with repairs; oversee the repairs; maintain the equipment; and maintain the building and grounds without ever observing the employees or inspecting the equipment. It is clearly unreasonable to determine that the maintenance supervisor of a manufacturing plant can perform all material and substantial duties while sitting in an office. SUN 1981. Despite the above, despite common sense, despite Gittings' descriptions of his job duties, Sun Life chose to rely of Mr. Feuerbacher assertion that a maintenance supervisor is an office job which involves mostly sitting. *Id.* Sun Life adopts a description that in no way reflects the actual job description of a maintenance supervisor.

All the substantial and material duties of a Maintenance Supervisor required physical demands. Gittings was unable to perform any of the physical demands of his job as Maintenance Supervisor after his accident in August 2005. Sun Life performed a selective review in order to continue deny Plaintiff his long term disability benefits. Sun Life relied on the Tredegar employees who had never performed the duties of a maintenance supervisor and had never observed Gittings on the job or any maintenance supervisor for that matter. These employees completely revamped the current job description, reclassified the maintenance supervisor position, and Sun Life accepted this. Further, Sun Life completely disregarded all submissions by Gittings; the only individual who actually held the position of Maintenance Supervisor. Gittings was unable to perform all material and substantial duties as maintenance supervisor because of the physical demand requirements. Gittings was Totally Disabled on the day of termination.

### V. Plaintiff's Work Schedule & Pay

Sun Life previously denied Plaintiff's claim because he was working full-time and receiving his full paycheck when he was terminated and therefore "must have been" performing the material and substantial duties of his job. SUN 212. This court has already stated that the nothing in the Plan language "requires that Gittings not be working at all or that he must have suffered a loss of income to qualify as Totally Disabled." SUN 248-49.

Regarding the argument that Gittings cannot be considered Totally disabled because he was paid his full paycheck, this court stated:

> The language about less than full earnings that is present in the Partial Disability definition is conspicuously absent from the definition of Totally Disabled, so that ordinary rules of contract construction call for a negative inference rather than that advanced by Plan. Hence Gittings receipt of his full pay for his last day of

full time employment does not render him ineligible for long term disability
benefits under Plan. SUN 249-50.

Regarding the arguments that Gittings cannot be considered Totally Disabled because he was working full time, the court stated: No Plan language requires him not to have been working at all. Instead Total Disability requires only that Gittings be unable to perform "all of the material and substantial duties of his own occupation," not of any occupation at all. SUN 250. Plaintiff returned to work for Tredegar but he was unable to perform the duties of his maintenance supervisor position. Instead, Plaintiff did light office work due to his physical restrictions, which was not a normal job function of a maintenance supervisor, up until his termination on January 27, 2006. As described above, plaintiff's material and substantial duties as maintenance supervisor were physically demanding. Plaintiff could not perform his material and substantial duties after his accident in August 2005. Thus, Plaintiff was unable to perform all of the material and substantial duties of his occupation.

## PROPOSED CONCLUSIONS OF LAW

Jurisdiction lies in this Court pursuant to, 28 U.S.C. §1331 and 29 U.S.C. § 1132. Answer ¶ 13. Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. §1391(b), as Plaintiff's causes of action arose herein. Answer ¶ 14.

### I. Standard of Review

1. Because Sun Life did not give itself discretionary authority to determine eligibility under The Plan, the applicable standard of review is *de novo*. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). *De novo* review means that the court considers evidence and makes an independent decision about how the language of the plan applies to those facts. *Krolnik v. Prudential Ins. Co. of America*, 570 F.3d 841, 843 (7th Cir. 2009).

### II. Plaintiff is Eligible for Coverage under the Sun Life Long Term Disability Policy

1. Plaintiff was eligible for coverage under the Sun Life Policy at the onset of his Total Disability.

2. Total disability as defined by the Plan occurs when the employee, because of Injury or Sickness, is unable to perform all material and substantial duties of his own occupation. SUN13.

3. On September 9, 2005, Plaintiff ceased performing all of the material and substantial duties of his occupation due to complications from his motorcycle accident which developed into

12

a permanent disability. SUN 126-128. At no point did he resume performing the material and substantial duties of his occupation before his termination on January 27, 2006. SUN 159-160

2.  Plaintiff returned to work on light duty and performed light office work up until his termination on January 27, 2006. Plaintiff's assertion that he only performed light duty office work is supported by the Attending Physician Statement, Plaintiff's medical records, and Plaintiff's file from the Social Security Administration. These records demonstrate that Plaintiff was severely limited in his physical abilities and eligible for long term disability benefits.

3.  Light office work was not a substantial and material duty of a maintenance supervisor. The material and substantial duties of a maintenance supervisor were physically demanding. SUN 1973-1976. Plaintiff was and is, incapable of performing physical activity. *Id.* Therefore, it is impossible that Plaintiff was performing the substantial and material duties of the physically demanding job of a maintenance supervisor. SUN 110, 127.

### III. Plaintiff is Totally Disabled under the Plan and Eligible for Disability Benefits

1.  To be eligible for long term disability income benefits under The Plan, an employee must (1) show that he is unable to perform all material and substantial duties of his own occupation; (2) during the Elimination Period and the next 24 months; and (3) be under regular care by a physician. Disability benefits continue after the first 24 months if the Employee is unable to perform all of the material and substantial duties of any occupation for which he is or becomes reasonably qualified for by education, training, or experience. SUN 13.

2.  Plaintiff meets all elements required for Long Term Disability income benefits, and Sun Life's policy requires that he be found disabled from his own occupation or any occupation.

3.  The injury to Plaintiff's knee caused him severe pain and limited mobility. SUN 126. He can only stand or walk for short periods of time. SUN 127. He is completely unable to bend, stoop, crawl, climb, or kneel. SUN 127. As a result of his physical limitations, Plaintiff was unable to perform all of the material and substantial duties of his own occupation during the six month Elimination Period and the next 24 months. SUN 110-111, 160; SUN 316-325; SUN 470; SUN 472-473.

4.  Plaintiff's physician confirmed his condition is not going to improve over time, in fact, his disability is expected to worsen. SUN 472-473. On November 1, 2006, Plaintiff filed for Social Security Disability Insurance, which was granted and he was declared disabled, unable to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. SUN 3480-3482; 42 U.S.C. §423(d).

5.     Plaintiff is still disabled as defined by the Social Security Act and is unable to work in his occupation. SUN 3480-3482.

6.     Plaintiff is under the regular care of Dr. Krpan, who indicated that he treats Plaintiff approximately every three to four months for an evaluation of Plaintiff's knee. SUN 126.

## **REMEDY**

Plaintiff's case should be reversed. Where an insurer conducted a selective review of the evidence resulting in an unreasonable conclusion, awarding benefits retroactively, as opposed to remanding the case to the insurer, is appropriate. *DiPietro v. Prudential Ins. Co.*, 2004 WL 626818 *11 (N.D. Ill.), *White*, 364 F.Supp.2d at766. Here, Sun Life has conducted a selective review of the evidence resulting in an unreasonable conclusion. Plaintiff should be awarded his benefits retroactively.

Plaintiff has clearly shown he is totally disabled as defined by the Plan. Plaintiff cannot return to his regular occupation or any other occupation and is therefore entitled to all benefits due under the plan, including (a) back benefits from the time of eligibility through the present; (b) interest accrued on all past-due benefits; (c) reinstatement of benefits from the present through the age of 65 per the terms of the policy; and (d) attorney's fees in bringing this action. *Fritcher v. Health Care Service Corp.*, 301 F.3d 811, 819-820 (7th Cir. 2002); *Rudzinski v. Metropolitan Life Insurance Co.,* 2007 WL 2746630 (N.D.Ill.). The Court should award Plaintiff's prejudgment interest at a rate of 9% pursuant to 215 ILCS 5/357.9.

Plaintiff is entitled to past due benefits from August 22, 2005 through July 2011 in the amount of $73,014.27. This is calculated by using a net monthly benefit of $1,028.37 (70% of $4,397.67 monthly salary minus his social security award of $2,050.00). Plaintiff is entitled to 9% interest annually on his back benefits, in the amount of $6,663.84 Plaintiff's benefits should be reinstated in the amount of $1,028.37, per month from the date of this Court's ruling through the age of 65. SUN 6.

Plaintiff is also entitled to an award of attorney's fees pursuant to 29 U.S.C. §1132(g), and there is a presumption in favor of such an award. *Fritcher v. Health Care Svc. Corp.,* 301 F.3d 811, 818 (7th Cir.2002). An award of attorney fees is fair in light of the parties' respective

positions, as Plaintiff should not be required to bear the burden of retaining counsel out of his disability payments to secure what he was entitled to under a benefits plan he contributed to paying for throughout his over thirty year career at Tredegar. Inasmuch as Sun Life's denial of benefits was not "substantially justified," Sun Life must be responsible for Plaintiff's costs and fees associated with this suit, in an amount to be determined after submission of a fee petition subsequent to entry of an award by this Court in Plaintiff's favor.

Respectfully submitted,
DALE C. GITTINGS

By: _/s/ John C. Kreamer_____

**Best, Vanderlaan & Harrington**
John C. Kreamer
Susan J. Best
25 E Washington Street #210
Chicago, IL 60602
312.819.1100
312.819.8062
Attorney No.: 6270111

## Certificate of Service

I, the undersigned, an attorney, certify that I caused to be served the foregoing document with attachments referred to therein, if any, by filing the same with the Northern District of Illinois' Electronic Case Filing System ("ECF"), which forwards copies to the attorney(s) of record at the address(es) of record, this 20th day of June 2011. Parties may also access this filing on ECF.

*/s/ John C. Kreamer*